Argued and submitted August 2, 1983, reversed and remanded July 10, 1984

# STATE OF OREGON,
*Respondent on Review,*

*v.*

# CALVIN ROY OTT,
*Petitioner on Review.*

(TC 80-522-C; CA A23254; SC 29428)

686 P2d 1001

Donald H. Coulter, Myrick, Coulter, Seagraves, Myrick & Adams, Grants Pass, argued the cause and filed briefs for petitioner on review.

Christine L. Dickey, Assistant Attorney General, argued the cause for respondent on review. With her on the brief were Dave Frohnmayer, Attorney General, and William F. Gary, Solicitor General, Salem.

LENT, J.

## LENT, J.

■     The primary issue is how a jury is to be instructed on "extreme emotional disturbance" for the purpose of determining whether a criminal homicide[1] is murder or manslaughter. The defendant was charged with murder for killing his wife in April, 1980. It is undisputed that the defendant killed her intentionally; the dispute is whether he was under the influence of extreme emotional disturbance. If he was, he would be guilty of manslaughter rather than murder.[2]

At that time[3] ORS 163.115 provided:

"(1)   * * * [C]riminal homicide constitutes murder when:

"(a)   It is committed intentionally by a person who is not under the influence of an extreme emotional disturbance.

"* * * * *

"(2)   For the purposes of paragraph (a) of subsection (1) of this section, a homicide which would otherwise be murder is committed under the influence of extreme emotional disturbance when such disturbance is not the result of the person's own intentional, knowing, reckless or criminally negligent act, and for which disturbance there is a reasonable explanation. The reasonableness of the explanation for the disturbance shall be determined from the standpoint of an ordinary person

---

[1] ORS 163.005 in pertinent part provides:

"(1) A person commits criminal homicide if, without justification or excuse, he intentionally * * * causes the death of another human being.

"(2) 'Criminal homicide' is murder, manslaughter or criminally negligent homicide."

[2] See ORS 163.115 and 163.118 prior to amendment by Oregon Laws 1981, chapter 873, sections 5 and 6.

At times during this opinion we may refer to the mitigating factor as a "defense." Where we do so, it is for convenience of expression only. We recognize that we do not deal with a defense, such as "self defense," which, when found to exist, completely exonerates a defendant of criminal responsibility. Intentionally killing while under the influence of extreme emotional disturbance does not present a true "defense," for the punishment is merely reduced through the mechanism of denominating the crime as "manslaughter" rather than "murder." It could be considered a "partial defense" in the sense that an acquittal of the charge of murder occurs when the jury finds that the defendant is guilty only of manslaughter.

[3] In 1981 ORS 163.115, 163.118 and 163.135 were amended for the apparent purpose of making it an "affirmative defense" that a defendant committed criminal homicide under the influence of extreme emotional disturbance, which would reduce the crime from murder to manslaughter. Or Laws 1981, ch 873, §§ 5 and 6.

in the actor's situation under the circumstances as the actor reasonably believes them to be."

At the time of this homicide the state, in order to convict a killer of murder, had to prove beyond a reasonable doubt that the defendant was not under the influence of extreme emotional disturbance.

The defendant was convicted of murdering his wife. At trial he did not contest the accusation that he killed her intentionally. Instead, he adduced evidence to mitigate the charge of murder to that of manslaughter by showing that he was under the influence of an extreme emotional disturbance during the killing.

## THE EVIDENCE

A description of the evidence and the facts which could be found therefrom as perceived by the defendant is relevant to the question of whether he could have been found by the jury to be under the influence of extreme emotional disturbance when he committed the criminal homicide, thereby necessitating an instruction on extreme emotional disturbance. There was evidence of the following:

The defendant exhibited instability after his discharge from the Air Force in 1972. He "drifted in various parts of the United States" and put "very little order to his life." In 1975 he returned to his mother's home in Grants Pass and stayed there intermittently.

At some point after his return to Grants Pass, he began to cohabit with a woman who had three children. This lasted for a little over a year. The woman then asked the defendant to move out because of his drinking and unannounced disappearances. She was three months' pregnant by him at the time.

The defendant then enrolled at Rogue Community College at Grants Pass. There he met the now deceased Stephanie Elaine Brinkley, whom he married three weeks after their initial meeting. Some months after their marriage, they had a fight over "money matters" and separated. They were soon together again; however, not long thereafter welfare authorities threatened to cut off Stephanie's assistance unless

they separated. The defendant moved out, joined a mining operation and made a small amount of money.

Defendant attempted to return to his wife; however, she had begun seeing someone else. Defendant attempted to fight Stephanie's new lover. Stephanie intervened, sent her new lover away and promised that her conduct would not be repeated.

There were other separations, and the defendant, upon his return from each separation and his learning of more infidelities, became progressively more upset. This was especially so after the birth of their first child.

At one point, upon Stephanie's invitation to resume living together, the defendant returned home to find his wife engaged in sex with another man. A fight ensued. The police were called, and the defendant was arrested for the crime of menacing. Upon arraignment, the court in that case observed that defendant appeared to be emotionally disturbed.

After his conviction in that case, the court ordered a presentence report. The report contained a psychological evaluation which indicated the possibility that defendant could exhibit psychotic behavior under stress and recommended that the defendant be treated with therapy and medication. Defendant was given a three-year suspended sentence and was released from jail subject to the condition that he receive counseling from the county mental health department. Although he received counseling, he never received any medication.

He had been warned by the "authorities" to stay away from Stephanie. She apparently caused him to be placed under a judicial restraining order; however, despite her obtaining the order, Stephanie telephoned him regarding their divorce. They engaged in an apparently protracted series of arguments on the telephone over child custody, which eventuated in the defendant's arrest and jailing for harassment. Even though they engaged in arguments and fights, they continued to associate. Defendant could not stay away from Stephanie and Stephanie did not always discourage his attentions.

In 1980 Stephanie began to live with another man. This conduct affected the defendant, as before, with tension and "stress." The defendant's reaction was even more intense

than before, and he threatened to kill Stephanie on several occasions.

In early April, 1980, Stephanie's son, Jonathan (defendant's stepson), broke his arm and was in the hospital. The defendant and Stephanie met each other at the hospital in order to visit with the child on three occasions. It was arranged that on the third occasion the defendant was to drive Stephanie home after hospital visiting hours were over. Defendant had the impression from their first two meetings at the hospital that the relationship was improving. He was thus angered and disappointed when his wife's new lover appeared at the hospital on their third meeting to take her home. Defendant left the hospital in a state of agitation. He retrieved a .22 rifle that he had stored at the home of a friend, caught up with his wife and her lover, ran their truck off the road and shot his wife three times.

We emphasize that the foregoing paragraphs are not findings of fact by this court; they are a set of facts which could be found from the evidence. There was other evidence, which was in some respects contradictory.

## HISTORY OF MITIGATING FACTOR

Before addressing how a jury should be charged in a case where the influence of extreme emotional disturbance may reduce an intentional criminal homicide from murder to manslaughter, we pause to examine the history of the mitigating factor.

The defense of extreme emotional disturbance is a modification of the defense of provocation or heat of passion. The provocation defense is very old. The distinction between a slaying in cold blood and one in the heat of passion existed in Anglo-Saxon criminal law and survived the Norman conquest of 1066.[4] The "Doctrine of Provocation" became firmly established in the law in 1628 when Coke adopted the distinction between homicide committed after deliberation and homicide committed in the course of a sudden quarrel.[5] Coke defined

---

[4] For a short history of the provocation defense, see Donovan, D. and Wildman, S., *Is the Reasonable Man Obsolete? A Critical Perspective on Self-Defense and Provocation,* 14 Loyola L Rev 435, 446-450 (1980). (Donovan and Wildman hereafter.)

[5] Donovan and Wildman at 446.

murder as necessitating "malice aforethought," as distinguished from manslaughter, which he understood occurs "upon a sudden occasion" and was, therefore, called "chance-medley."[6] Then, as now, manslaughter, understood as chance-medley, depended on the presence of heat of passion caused by adequate provocation.

As originally conceived, the only adequate provocation for heat of passion was mutual combat. Hence, heat of passion was difficult to distinguish from self defense. Other provocations were gradually recognized as legally adequate, including assault and adultery. In some jurisdictions, illegal arrest, injuries to third parties, and words conveying information of the occurrence of a legally sufficient ground have also been recognized.[7]

In the mid-nineteenth century, the judgment as to whether a provocation was adequate for the heat of passion defense was made by the judge as a determination of law;[8] however, judges gradually began to leave borderline cases to the jury. The reasonable man standard of review for provocation was devised as a manner of instructing the jury on marginal cases. It was also a device for enabling the jury to serve as community conscience or standard of measure for reasonable behavior.

The reasonable man test for provocation contained four elements: (1) there had to be a provocation that would arouse a reasonable man to the heat of passion; (2) the defendant must actually have been aroused to the heat of passion; (3) a reasonable man would not have cooled off; and (4) the defendant did not, in fact, cool off.[9] This has been said to be an objective test, meaning that neither the mental nor physical peculiarities of the accused are evaluated in determining whether his loss of self-control was reasonable.[10]

---

[6] The term "chance-medley"is probably a corruption of "chaud melee." *Dressler, Rethinking Heat of Passion: A Defense in Search of a Rationale,* 73 Journal of Criminal Law and Criminology 421, fn. 2 (1982).

[7] Donovan and Wildman at 446-447.

[8] R. Perkins, *Criminal Law,* 55 (2nd Ed 1969).

[9] Donovan and Wildman at 448.

[10] Id.

## CRITICISM OF THE "ORDINARY" OR "REASONABLE" MAN TEST

As originally developed, the provocation defense represented the concept that the mental state of the accused was the test for moral culpability; however, the objective test does not focus on the individual's mental state. The anomaly has been noted by several scholars.

"The reasonable man test, being objective in nature, is antithetical to the concept of mens rea. Like all objective standards, it is an external standard of general application that does not focus on an individual accused's mental state. Thus, from the point of view of traditional Anglo-American jurisprudence, a paradox is inherent in the use of the reasonable man standard to test criminal responsibility: the presence or absence of criminal intent is determined by a standard which ignores the mental state of the individual accused." (Footnotes omitted)[11]

The common law heat of passion or provocation defense placed the jury in the conceptually awkward (to put it kindly) position of having to determine when it is reasonable for a reasonable man to act unreasonably. In an article on the subject, Granville Williams explained:

"In the law of contract and tort, and elsewhere in the criminal law, the test of the reasonable man indicates an ethical standard; but it seems absurd to say that the reasonable man will commit a felony the possible punishment for which is imprisonment for life. To say that the 'ordinary' man will commit this felony is hardly less absurd. The reason why provoked homicide is punished is to deter people from committing the offence; and it is a curious confession of failure on the part of the law to suppose that, notwithstanding the possibility of heavy punishment, an ordinary person will commit it. If the assertion were correct, it would raise serious doubts whether the offence should continue to be punished.

"Surely the true view of provocation is that it is a concession to 'the frailty of human nature' in those exceptional cases where the legal prohibition fails of effect. It is a compromise, neither conceding the propriety of the act nor exacting the full penalty for it. This being so, how can it be that that paragon of virtue, the reasonable man, gives way to provocation?"

---

[11] Id. at 451.

Williams, *Provocation and the Reasonable Man,* 1954 Crim L
Rev 740, 742.

Another writer calls the conundrum of figuring out
when a reasonable man will unreasonably kill an "impossible
question."[12] Yet another writer comments that:

> "Abandonment of the reasonable man standard would
> simplify the jury's task because the inquiry into the accused's
> own mental state is more concretely grounded in reality than
> are conjectures about a mythical reasonable man."[13]

## THE MODEL PENAL CODE

The drafters of the Model Penal Code were aware of
the anomaly and pointed out that harsh and unjust results
were obtained from applying the objective test for provoca-
tion. They cited *State v. Gounagias,* 88 Wash 304, 153 P 9
(1915), as a model of an unjust result achieved through
application of the objective test for provocation.[14] That case
may serve as an illustration of the test for provocation and
also, by negative implication, of the object of modifying that
defense.

While lying in a drunken stupor, Gounagias, a mem-
ber of the "Greek community," was sodomized by another
member of that community. Outraged and greatly embar-
rassed, he upbraided his assailant the next morning and asked
him not to spread any stories among other members of the
community about what had happened. The assailant, how-
ever, proved unsympathetic. From taunts, conversational
innuendos and jeering signs, Gounagias realized that the story
had been spread far and wide. His anger and isolation from the
rest of his community increased at every embarrassing innu-
endo. Some weeks after the original incident, Gounagias went
to a coffee house where an incident occurred which, in the
words of the court, "excited and enraged" him. He went home,
retrieved a pistol hidden under his mattress, and went to the
home of his assailant. By the light of a match, Gounagias

---

[12] Ingber, S., *A Dialectic: The Fulfillment and Decrease of Passion in Criminal Law,* 28 Rutgers L Rev 861, 947 (1975).

[13] Donovan and Wildman at 458.

[14] Model Penal Code, Tentative draft No. 9 at 47, 48.

found him asleep in his bed and shot him five times in the head.

Charged with murder, Gounagias asked for mitigation based on the common law defense of provocation. The Supreme Court of Washington set out the standard for that defense as follows:

"* * * if the act of killing, though intentional, be committed under the influence of sudden intense anger or heat of blood obscuring the reason, produced by an adequate or reasonable provocation, and before sufficient time has elapsed for the blood to cool and reason to reassert itself, so that the killing is the result of temporary excitement rather than of wickedness of heart or innate recklessness of disposition, then the law, recognizing the standard of human conduct as that of the ordinary or average man, regards the offense so committed as of less heinous character than premeditated or deliberate murder. Measured, as it must be, by the conduct of the average man, what constitutes adequate cause is incapable of exact definition."

88 Wash at 311-312. In explanation of the doctrine, the court added:

"We apprehend that the true rule is precisely the same as that in other cases where reasonableness of human conduct is necessarily measured by the conduct of the ordinary or average man in like situation, so frequently announced and applied in cases where the ultimate question is one of negligence."

88 Wash at 315.

With this understanding of provocation, the Washington court reached the conclusion that Gounagias waited too long after the original incident for provocation to be a reasonable explanation of his behavior. In the words of the court:

"To say that these repeated demonstrations, coupled with the original outrage, *culminated* in a sudden passion and heat of blood when he encountered the same character of demonstration in the coffee house on the night of the killing is to say that sudden passion and heat of blood, in the mitigative sense, may be a cumulative result of repeated reminders of a single act of provocation occurring weeks before, and this, whether that provocation be regarded as the original outrage or the spreading of the story among appellant's associates, both of which he

knew and fully realized for three weeks before the fatal night. This theory of the cumulative effect of reminders of former wrongs, not of new acts of provocation by the deceased, is contrary to the idea of sudden anger as understood in the doctrine of mitigation. In the nature of the thing, *sudden* anger cannot be cumulative. A provocation which does not cause instant resentment, but which is only resented after being thought upon and brooded over, is not a provocation sufficient in law to reduce intentional killing from murder to manslaughter * * *."

88 Wash at 318.

The drafters of the Model Penal Code found it "shocking" to disregard that the passage of time served only to increase rather than diminish Gounagias' outrage as the story became known. Model Penal Code Tentative draft No. 9 § 201.3 at 48. They said:

"Though it is difficult to state a middle ground between a standard which ignores all individual peculiarities and one which makes emotional distress decisive regardless of the nature of its cause, we think that such a statement is essential. For surely if the actor had just suffered a traumatic injury, if he were blind or were distraught with grief, if he were experiencing an unanticipated reaction to a therapeutic drug, it would be deemed atrocious to appraise his crime for purposes of sentence without reference to any of these matters. They are material because they bear upon the inference as to the actor's character that it is fair to draw upon the basis of his act. So too in such a situation as *Gounagias,* supra, where lapse of time increased rather than diminished the extent of the outrage perpetrated on the actor, as he became aware that his disgrace was known, it was shocking in our view to hold this vital fact to be irrelevant."

## THE OREGON CRIMINAL LAW
## REVISION COMMISSION

Prior to 1971 Oregon law employed the concept of adequate provocation/heat of passion to distinguish murder from manslaughter. Section 506 of Deady's Code provided:

"If any person shall, without malice express or implied, and without deliberation upon a sudden heat of passion, caused by a provocation, apparently sufficient to make the passion irresistible, voluntarily kill another, such person shall be deemed guilty of manslaughter."

With only minor grammatical changes, the same statute survived through various revisions[15] to former ORS 163.040:

"(1)  Any person who, without malice express or implied, without deliberation, and upon a sudden heat of passion caused by a provocation apparently sufficient to make the passion irresistible, voluntarily kills another is guilty of manslaughter."

In its consideration of this aspect of the substantive law of criminal homicide, the Criminal Law Revision Commission (Commission) was greatly influenced by the work of the drafters of the Model Penal Code. The language of the Model Penal Code drafters that we have quoted just above was copied with approval by the Commission in its Commentary. *See* Proposed Oregon Criminal Code, Final Draft and Report, July 1970, p. 89.

The Commission recognized, however, as Justice Holmes had argued,[16] that there is a need for establishing a standard to fix an average conduct to protect the general welfare. A purely subjective test would subtract from incentive to maintain self-control. The Commission chose an intermediate position:

"The draft section also introduces a larger element of subjectivity, though it is only the actor's 'situation' and 'the circumstances as he believes them to be,' not the defendant's scheme of moral values, that are thus to be considered. The ultimate test, however, is objective; there must be 'reasonable' explanation or excuse for the actor's disturbance. Thus, the draft retains a certain degree of the objective standard but turns away from the present Oregon law which apparently gauges the accused's acts on a purely reasonable man test without reference to the accused's circumstances or relevant personal characteristics."

Proposed Oregon Criminal Code, Final Draft and Report, July, 1970, p. 89.

## LEGISLATIVE MODIFICATION

The Commission presented to the legislature the following subsection:

---

[15] D&L, § 510; H, § 1718; B&C, § 1745; LOL, § 1897; OL, § 1897; OC 1930, § 14-205.

[16] O.W. Holmes, *The Common Law,* 49-50 (38th Ed 1945).

"(1)  Criminal homicide constitutes manslaughter when:

"* * * * *

"(b)  A homicide which would otherwise be murder is committed under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation and excuse. The reasonableness of such explanation and excuse shall be determined from the standpoint of a person in the actor's situation under the circumstances as he believes them to be."

Early on, members of the legislature and witnesses questioned whether this approach was too subjective. The author of the language of the Commission's proposal expressed the Commission's view:

"The balancing factor * * * is that the test is not all that subjective in that the reasonableness of the explanation given by a defendant 'shall be determined from the standpoint of a person in the actor's situation under the circumstances as he believes them to be.' This requirement * * * inserts some objectivity into a highly subjective standard. There are some real problems now with the old provocation formula * * * that this new definition is intended to avoid.

"* * * * *

"* * * [The Commission] concluded that the old provocation formula is much too narrow; it does not recognize modern understanding of personalities; and, for those reasons alone, there ought to be an expansion of the kind of evidence that is legally permissible in a trial. The Commission * * * heard evidence that, in fact, this kind of evidence is presently common in Oregon and is heard by members of the jury. The proposed provision would formalize this and allow the court to recognize it and instruct on it."

Senate Criminal Law & Procedure Committee Minutes of February 16, 1971, pages 8-9.

By March 5, 1971, controversy over whether the test was too subjective led to amendment of the section so as to read essentially as it now does. Senate Criminal Law & Procedure Committee Minutes, March 5, 1971, pages 6-7. We must conclude from this legislative history that the legislature, as distinguished from the Commission, intended to present a test to be used by court and jury that would measure the reasonableness of the explanation for the disturbance more objectively than that proposed by the Commission.

## THE TRIAL COURT'S INSTRUCTION

The trial court instructed:

"So far as here applicable, the statutory law of Oregon provides in effect that a criminal homicide when it is committed intentionally constitutes murder unless at the time of the homicidal act the Defendant was under the influence of an extreme emotional disturbance, when such disturbance is not the result of the person's own intentional, knowing, reckless or criminally negligent act, and for which disturbance there is a reasonable explanation. The reasonableness of the explanation for the disturbance shall be determined from the standpoint of an ordinary person in the actor's situation under the circumstances as the actor reasonably believes them to be.

"In this case there may be evidence to show that if the Defendant did in fact commit a homicide as charged, he did so while he was under the influence of an extreme emotional disturbance. The concept of extreme emotional disturbance is not to be confused with the defense of mental disease or defect, which defense prevents a Defendant from being held criminally responsible. The defense of mental disease or defect has not been raised and therefore is not applicable to this case. On the other hand, a Defendant who intentionally kills another person, the act being committed under the influence of extreme emotional disturbance, is still held criminally responsible, but is guilty of the lesser offense of manslaughter in the first degree instead of murder.

"I instruct you that the concept of extreme emotional disturbance involves several issues, all of which must be considered by you. One, the homicidal act must have been committed under the influence of an extreme emotional disturbance, and two, the extreme emotional disturbance must not be the result of the Defendant's own intentional, knowing, reckless or criminally negligent act. Thus, a person may not form an intent to commit murder and later because of that intent become extremely emotionally disturbed, and three, the extreme disturbance must be an extreme emotional disturbance. You are instructed that there are varying degrees of emotional disturbance. Not every disturbance is an extreme emotional disturbance in the law. In determining what the term extreme means with reference to extreme emotional disturbance I instruct you that the term means the outermost or furtherest, most remote in any direction, final or last, and four, there must be a reasonable explanation to the extreme emotional disturbance and its resulting homicidal act.

"I instruct you that the reasonableness of the explanation for the extreme emotional disturbance shall be determined from the standpoint of an ordinary person in the Defendant's situation under the circumstances as the Defendant reasonably believes them to be. You are further instructed that when you consider the reasonableness of the explanation for an extreme emotional disturbance and its resulting homicidal act, you are not to use the defendant's scheme of moral values or the Defendant's personality characteristics. You may only use the scheme of moral values and personality characteristics which would be possessed by an ordinary person in our society today, and fifth, the prosecution must prove the nonexistence of any extreme emotional disturbance beyond a reasonable doubt.

"Extreme emotional disturbance simply means, in the end, that an actor's loss of self control can be understood by a jury in terms that arouse the jury's sympathy to such an extent that the jury feels that the criminal consequence of murder ought, under all the circumstances, to be mitigated to manslaughter in the first degree.[17]

"You are instructed that the State must prove all of the elements of the charge of murder beyond a reasonable doubt as previously instructed. However, to prove the nonexistence of the concept of extreme emotional disturbance beyond a reasonable doubt the State need only prove one of the following beyond a reasonable doubt: One, the homicidal act was not committed under the influence of an extreme emotional disturbance, or two, extreme emotional disturbance was the result of the Defendant's own intentional, knowing, reckless or criminally negligent act, or three, the emotional disturbance was not an extreme one as I have defined that term, or four, there was no reasonable explanation for the extreme emotional disturbance and its resulting homicidal act when the reasonableness of the explanation has been determined from the standpoint of an ordinary person in the Defendant's situation under the circumstances as the Defendant's [sic] reasonably believed them to be.

"Extreme emotional disturbance is not to be measured in point of time. In other words, extreme emotional disturbance is not necessarily created in a sudden heat of passion or triggered by a sudden or provocative event. It may be created

---

[17]This is a statement of policy underlying the recognition that certain circumstances should result in mitigation of homicide from murder to manslaughter. The jury should not be instructed on the policy.

over an extended period of time. In order to be a mitigating factor in a homicide, however, it must exist at the same time as the homicidal event."

The defendant duly excepted to the instruction.[18] The exceptions may be summarized as raising the following points:

(1) The trial court should not elaborate on the term "extreme emotional disturbance."

(2) If a trial court is to elaborate, the exposition should address the term as a whole.

(3) A dictionary definition of the word "extreme" should not have been given, but even if one should have been given, the trial court chose the wrong definition.

(4) The instruction unduly emphasized the word "extreme."

(5) The instruction struck an improper balance between objective and subjective considerations important to determination of the existence of extreme emotional disturbance.

(6) The instruction forbade the jury to consider the "personality" characteristics of the defendant in resolving this issue.

(7) The instruction told the jury that in order to reduce the homicide to manslaughter, extreme emotional disturbance must be the cause of the homicide.

The trial judge employed an explanation drawn from the decision of the Court of Appeals in *State v. Ackridge,* 23 Or App 633, 635, 543 P2d 1073 (1975), in which a dictionary definition of "extreme" was given and approved:

"I instruct you that the term [extreme] means the outermost or furthest; most remote in any direction; final; or last."

In *State v. Carson,* 292 Or 451, 640 P2d 586 (1982), this court was concerned with the meaning of the term in the context of deciding whether there was sufficient evidence to submit to the jury the issue of the defendant being under the influence of extreme emotional disturbance. We held that we need not, in

---

[18] The oral exceptions to this part of the charge cover some 20 pages of the transcript and reveal that defense counsel's preparation for this aspect of the trial of the case was thorough.

that context, reach a contention that the *Ackridge* approved definition was correct. In this case the defendant has made a frontal assault on the *Ackridge* definition. As stated in defendant's petition for review:

> "It is the whole statutory phrase that has significance, not the single word; common words do not require a dictionary definitional instruction to juries; and, most importantly, the drafters of the Model Penal Code [from which the statute in question was drawn] did not intend that it be judicially refined; they deliberately left latitude in interpretation and application to the trier of fact."

Both in the trial court and on appeal the defendant has argued that the term "extreme emotional disturbance" is made up of words of ordinary meaning, not given any special definition by the legislature and, therefore, there is no reason or need for a trial court to enlarge upon them for the benefit of the jury. In response to questions from this court, the defendant filed a supplemental memorandum supporting the contention that the term "extreme emotional disturbance" should not be defined when giving jury instructions. Defendant also made this argument orally before the court.

The state counters that this court has often held that the trial courts are to be allowed broad discretion in deciding whether to explain terms to a jury and that forbidding such explanations would be a step backwards in a perceived trend to make the jury's task of applying the law to the evidence easier. We do not find it necessary to review at any length the cases cited by the state. We agree that the phrase with which this case is involved can and should be explained. "Extreme emotional disturbance" is too easily confused with the "insanity" defense. *See* ORS 161.295 to 161.351.

We agree with the defendant that the jury should be instructed on the meaning of the whole term rather than singling out the word "extreme" for amplification. The point of the extreme emotional disturbance defense is to provide a basis for mitigation that differs from a finding of mental defect or disease to such an extent as altogether to preclude criminal responsibility.[19]

---

[19] The New York Court of Appeals has expressed the difference somewhat differently than we do here. In *People v. Patterson,* 39 NY2d 288, 383 NYS2d 573, 347 NE2d 898, 907 (1976), it was stated:

The *Ackridge* definition of the word "extreme" and the implication that that definition is the key to the meaning of the term "extreme emotional disturbance" derogates from the aim of providing a mitigating circumstance short of temporary derangement. The notion of "extreme" provided for the jury by the *Ackridge* court is consonant with an understanding of emotional disturbance that might preclude criminal responsibility. The words "outermost or furthest, most remote in any direction, final or last," as used by the court to define "extreme," would seem to require a state of mind so far from the norm as to be characteristic of a mental illness. The defense was meant to be understood in more relative terms as referring to a loss of self-control due to intense feelings.

Furthermore, the *Ackridge* definition may also be evocative of the old heat of passion defense. The *Ackridge* definition contains no hint of the possibility that "a significant mental trauma" could have "affected a defendant's mind for a substantial period of time, simmering in the unknowing subconscious and then inexplicably coming to the fore." *People v. Patterson,* 39 NY2d 288, 303, 383 NYS2d 573, 347 NE2d 898 (1976). Instead, the *Ackridge* definition implies that the disturbance must be visibly manifest in all of its compelling intensity.

Defendant's argument that defining the word "extreme" alone obscures the meaning of the whole term "extreme emotional disturbance" only begins to disclose why the *Ackridge* instruction is misleading. The principle of *noscitur a sociis* applies (the meaning of a term is ascertained in relation to the terms associated with it). *Eugene Theatre et al v. Eugene et al,* 194 Or 603, 604, 619, 243 P2d 1060 (1952). That decision underscores the sometimes need to resort to the context to perceive the meanings of words. In this case, the context is not limited to the words of a phrase. Rather, the phrase of which the word is a part is situated in a context of policy formulation and the development of legal precedent that gives the entire phrase an independent legal significance

---

"The purpose of the extreme emotional disturbance defense is to permit the defendant to show that his actions were caused by a *mental infirmity not arising to the level of insanity,* and that he is less culpable for having committed them * * *." (Emphasis added.)

from which the word in question must take its meaning. The *Ackridge* instruction fails to take into account the matrix of ideas and concerns from which the whole term takes its significance.

An explanation of the term "extreme emotional disturbance" which reflects the situational or relative character of the concept was given in *People v. Shelton,* 88 Misc2d 136, 149, 385 NYS2d 708, 717 (1976), as follows:

"That extreme emotional disturbance is the emotional state of an individual who: * * * (b) is exposed to an extremely unusual and overwhelming stress; and (c) has an extreme emotional reaction to it, as a result of which there is a loss of self-control and reason is overborne by intense feelings, such as passion, anger, distress, grief, excessive agitation or other similar emotions."

We find ourselves in agreement with the Court of Appeals of New York as to the meaning and place of the term "extreme emotional disturbance" in this context. In *People v. Casassa,* 49 NY2d 668, 427 NYS2d 769, 404 NE2d 1310, 1316 (1980), in discussing the defense that court acknowledged that its discussion and description of the defense

"provides no precise guidelines and necessarily leaves room for the exercise of judgmental evaluation by the jury. This, however, appears to have been the intent of the draftsmen. 'The purpose was explicitly to give full scope to what amounts to a plea in mitigation based upon a mental or emotional trauma of significant dimensions, with the jury asked to show whatever empathy it can.' (Wechsler, Codification of Criminal Law in the United States: The Model Penal Code, 68 Col. L. Rev. 1425, 1446.)"

We conclude that in instructing a jury on the meaning of the term "extreme emotional disturbance" a trial court, after proper instruction as to the burden of persuasion, should pose the issue in terms of whether defendant was under the influence of an emotional disturbance to the extent that he lost his self-control that would have otherwise prevented his committing the homicide.

We have still to determine how a jury is to determine whether there was a reasonable explanation for the emotional disturbance. This is a sensitive task because the Oregon statute requires that the "reasonableness of the explanation

for the disturbance shall be determined from the standpoint of an ordinary person," ORS 163.135(1). On the other hand, the statute requires that the reasonableness of the interpretation must be judged from the standpoint of "the actor's situation under the circumstances as the actor reasonably believes them to be." The juxtaposition of these two requirements for determining the adequacy of the explanation prevents the adequacy from being determined on either wholly objective or subjective grounds. The words "ordinary person" and "reasonableness of the explanation" recall the reasonable man standard of the heat of passion defense, which is an objective test, while the requirement of taking into account the actor's situation suggests a more subjective analysis.

This legislative mix of the "ordinary" person's views and the subjective belief of the defendant as to the reasonableness of his conduct in what the defendant believes the circumstances to be revives the grounds for the criticism of judicial analysis of the former adequate provocation/heat of passion defense, to which we have already referred. Under that former defense, personal characteristics of the defendant were not important. An example is found in *Bedder v. Director of Public Prosecutions,* WLR 1119, 2 All E R 801 (1954).

"Just as mental peculiarities do not give a privileged position in the law of provocation, so neither do physical peculiarities. This was decided by the House of Lords in *Bedder* [1954] 1 W.L.R. 1119; [1954] Crim. L. R. 721. The appellant was a youth of eighteen who was sexually impotent but who attempted to have sexual intercourse with a prostitute. Discovering his impotence she jeered at him and attempted to get away; he tried still to hold her, but (according to his evidence) she slapped him in the face, punched him in the stomach, and (when he pushed her back) kicked him in the private parts. The appellant thereupon stabbed her twice with a pocket knife, causing her death. The judge directed the jury in terms of what the reasonable or ordinary person would have done, and an appeal against a conviction of murder was dismissed both by the Court of Criminal Appeal and by the House of Lords. If the provocation was insufficient for a normal man, it could not help the accused that he was conscious of his impotence and therefore liable to be more excited if 'twitted' or attacked on the subject of that particular infirmity. In applying the test of the reasonable man, it could not be supposed that this hypothetical reasonable man in the position of the accused was himself impotent."

Williams, *Provocation and the Reasonable Man,* 1954 Criminal L Rev 740, 747. Similarly, Donovan and Wildman in their article, *Is the Reasonable Man Obsolete? A Critical Perspective on Self-Defense and Provocation,* hypothesize the following example:

> "An Asian-American man, Harold Sato, who had been interned in a detention camp for Japanese during World War II, faces repeated racial prejudice at his job. One day after repeated racial slurs from a co-worker he kills the co-worker."

14 Loyola L Rev 435, 438 (1981). The authors observe:

> "The anomaly of a purely objective standard of provocation is underlined by Mr. Sato's case * * *. A reasonable man, viewed in the abstract, is not likely to be roused to the heat of passion by a verbal insult. However, an Asian-American who had been interned in a concentration camp *is* likely to be roused to the heat of passion by racial slurs. To the extent that a jury is not allowed to consider Mr. Sato's racial background and previous experience of racial discrimination in determining his moral culpability, Mr. Sato is more likely to be convicted of murder * * * than of voluntary manslaughter."

*Id* at 449.

By requiring the factfinder to focus on a person in the defendant's "situation," the drafters of the Model Penal Code sought to work change. One writer, relying upon the Model Penal Code commentary, has put it:

> "[I]t makes the test more, although not entirely, subjective, by requiring the jury to test the reasonableness of the actor's conduct, 'from the viewpoint of a person in the actor's situation.' Thus, the actor's sex, sexual preference, pregnancy, physical deformities, and similar characteristics are apt to be taken into consideration in evaluating the reasonableness of the defendant's behavior." (Footnotes omitted.)

Dressler, *Rethinking Heat of Passion: A Defense in Search of a Rationale,* 73 Journal of Criminal Law and Criminology 421, 431 (1982).

■     As will be recalled, the Commission proposed to the Oregon legislature the Model Penal Code concept of viewing the matter from the standpoint of a person in the actor's situation. One must conclude that the Commission envisioned

that the actor's situation included the actor's personal characteristics.[20] A fair conclusion from the legislative treatment of the Commission's proposal is that the legislature was aware of this injection of subjectivity, yet the legislature made no change in that part of the Commission's proposal. The 1971 statute, originally and now, makes the test depend upon the actor's situation. We have found nothing to indicate that this does not include those "personal" characteristics noted by the drafters of the Model Penal Code.

In this case the trial court instructed that the jury was not to consider the defendant's "personality characteristics" but only the "personality characteristics which would be possessed by an ordinary person in our society today" in determining the reasonableness of the explanation for extreme emotional disturbance. Defendant argued that "personality characteristics" are a part of the actor's personal characteristics and thus of the actor's "situation" that must be taken into account in determining reasonableness.

■     The state answered that there is nothing in the legislative history, at either the Commission level[21] or the legislative level, to suggest that personality traits are properly to be considered. As the state argues, such an interpretation would permit the acquittal of a bad-tempered person of murder and the conviction of an even-tempered person of murder in "precisely the same situation and circumstances." We agree. As we noted, *supra,* at footnote 15 and accompanying text, the Commission did not go so far. We have no reason to believe that the legislature did so.

■     The other two bases for defendant's exception to the instruction will be treated briefly. The word "extreme" was not unduly emphasized in any sense other than that which we have already criticized. Although the adjective was used some 25 times, in all but three or four instances it was repeated only as a part of the statutory term "extreme emotional disturbance." As to the defendant's claim that the trial court told

---

[20] In its brief in the Court of Appeals, the state, apparently aware of the "legislative" history, candidly acknowledged:

"The actor's situation may include personal characteristics such as age, sex, race, nationality, physical stature, and mental and physical handicaps."

[21] As we have previously noted, the intent of the Commission is a clue to the intent of the legislature. *See, e.g., State v. Garcia,* 288 Or 413, 416, 605 P2d 671 (1980).

the jury that the charge could not be reduced to manslaughter unless the extreme emotional disturbance was the *cause* of the homicide, we do not agree that the trial court so charged. We express no opinion on the difference, if any, between causation and being under the influence of the disturbance.

## CONCLUSION

Given the hybrid approach adopted by the legislature to the weight to be accorded to subjective and objective factors in the calculus involved in this kind of case, we do not believe that any court can state a suggested jury instruction that is completely impervious to criticism of its logic. We must leave the trial courts and juries where the statute places them. Making the best of this situation, we conclude that a trial court's charge must be constructed for any particular case along the following general lines.

First, the jury's attention must be drawn to the relevant statutory text.

Second, the jury must be instructed as to the burden of persuasion on the issue.

■ ■ Third, the jury should be asked to consider whether the homicide was committed under the influence of extreme emotional disturbance. It was if the defendant was under the influence of an emotional disturbance to the extent that he lost the capacity to control himself and forego the homicide. The jury should be instructed that if it finds that the homicide was not committed under the influence of extreme emotional disturbance, the jury need not further consider the issue of mitigation of murder to manslaughter. If the jury finds that the homicide was committed under the influence of extreme emotional disturbance, it must then consider other issues.

■ ■ Fourth, the jury must determine whether the extreme emotional disturbance was the result of the defendant's intentional, knowing, reckless or criminally negligent act, and the meaning of those adjectives must be explained. If the jury finds that this causal relationship existed, it need not further consider the mitigation issue. If the jury finds this causal relationship not to exist, it must then consider the reasonableness of the explanation for the disturbance.

■ Fifth, the jury must determine what was the defendant's situation in the circumstances which the defendant reasonably believed to exist. The jury must then determine whether an ordinary person in that situation and those circumstances would have experienced extreme emotional disturbance.

■ In the case at bar, the trial court erred in instructing the jury in the terms of *Ackridge*. An adequate exception was duly taken. The error went to the heart of the case. The error was not harmless. Defendant is entitled to a new trial.

Reversed and remanded for a new trial.