Argued and submitted November 17, 2015, reversed and remanded
September 20, 2017

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## PETER JOHN ZIELINSKI,
*Defendant-Appellant.*

Marion County Circuit Court
11C40365; A155888

404 P3d 972

Kristin A. Carveth, Deputy Public Defender, argued the cause for appellant. With her on the briefs was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Jamie K. Contreras, Assistant Attorney General, argue the cause for respondent. On the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Armstrong, Presiding Judge, and Hadlock, Chief Judge, and Allen, Judge pro tempore.

## ARMSTRONG, P. J.

Defendant appeals a judgment of conviction, entered after a conditional guilty plea, for one count of murder with a firearm, ORS 163.115, ORS 161.610. Defendant assigns error to the trial court's exclusion of expert testimony that defendant had been diagnosed with an anxiety disorder, which he offered in support of a defense of extreme emotional disturbance (EED). We conclude that the trial court erred in excluding expert testimony that defendant had been diagnosed with an anxiety disorder. Accordingly, we reverse and remand.

The facts, which are largely procedural, are undisputed. Defendant was indicted on one count of intentional murder with a firearm for killing his wife, Lisa. Defendant filed notice under ORS 163.135 of his intention to raise the affirmative defense of EED and to offer expert testimony in support of the defense.[1] In response, the state moved to have defendant examined by a psychologist, which motion the court granted.

Defendant was first examined by Dr. Hulteng at the request of the defense. Hulteng prepared a written report that described the details of the examination and his findings. Defendant reported to Hulteng that he and Lisa had been experiencing marital problems for several

---

[1] ORS 163.135 provides, in part:

"(1) It is an affirmative defense to murder for purposes of ORS 163.115 (1)(a) that the homicide was committed under the influence of extreme emotional disturbance if the disturbance is not the result of the person's own intentional, knowing, reckless or criminally negligent act and if there is a reasonable explanation for the disturbance. The reasonableness of the explanation for the disturbance must be determined from the standpoint of an ordinary person in the actor's situation under the circumstances that the actor reasonably believed them to be. Extreme emotional disturbance does not constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime.

"(2) The defendant may not introduce in the defendant's case in chief expert testimony regarding extreme emotional disturbance under this section unless the defendant gives notice of the defendant's intent to do so.

"* * * * *

"(5) After the defendant files notice as provided in this section, the state may have at least one psychiatrist or licensed psychologist of its selection examine the defendant in the same manner and subject to the same provisions as provided in ORS 161.315."

weeks before the shooting. Lisa had told defendant that she wanted a divorce and, although he had been told by others that there was "probably somebody else," defendant pleaded with Lisa to stay with him and to attend marriage counseling.

One morning, defendant looked at Lisa's phone and discovered that Lisa had been exchanging text messages with her coworker, Jeff. The messages indicated that Lisa had gone out for a drink with Jeff the night before, which contradicted her statement to defendant that she had been at a client meeting and had then stayed at a bar to drink alone. When defendant confronted Lisa about the text messages, she told him that there was nothing going on with Jeff. However, defendant then examined Lisa's phone records and discovered hundreds of text messages between Lisa and Jeff. That night, defendant and Lisa attended a marriage-counseling session. When the counselor asked the couple what they hoped to achieve through counseling, Lisa stated, "Nothing."

On the Sunday morning before the shooting, defendant accessed Lisa's email account and discovered romantic email exchanges between Jeff and Lisa. Defendant "felt physically ill" when he read through the messages. That evening, when defendant confronted Lisa about the emails, Lisa admitted to having an affair with Jeff. She told defendant that she wanted to leave him and to plan a future with Jeff. Later, after defendant found more romantic emails between Lisa and Jeff, he called Jeff's wife to tell her about the affair and forwarded one of the emails to Lisa's boss and coworkers.

Defendant and Lisa got into an argument and, after it escalated, Lisa left the home. Defendant called Lisa and accused her of being with Jeff. Defendant told Hulteng that, at that moment, he "literally wanted to die." At some point that night, he got his handgun and pointed it at his head, but he stopped himself because he did not want his daughter to be the one who found him dead. Lisa returned home in the middle of that night. Defendant put his arm around her and told her that he loved her. She "grunted, was very annoyed," and asked him if he was serious.

The next morning, defendant woke up and saw Lisa sitting on their daughter's bed, text messaging with Jeff. Defendant was "at [his] wits end" and got into the shower. When defendant got out of the shower, he tried to give Lisa a hug, but she shook her head in disgust.

Defendant told Hulteng that he could not explain how he felt at that moment, but that all he could hear in his head was that he was "weak and spineless." As he left the bathroom to get a drink of water, he passed by his closet. Instead of going to get the glass of water, defendant went into the closet, grabbed his gun, and returned to the bathroom. He looked at Lisa, raised the gun, and pulled the trigger. Defendant told Hulteng that he felt like it was a dream, and that he did not feel like he was in control. Defendant said that he was telling himself, "no, no, don't do this," but that he "couldn't stop it."

After the shooting, defendant put the gun down, got dressed, and dropped his daughter off at her carpool. He once again had thoughts of suicide. Defendant called his mother and asked her to come look after his daughter. He then went to the police station to get help for Lisa. When officers arrived at defendant's home, they found Lisa dead on the bathroom floor.

During the psychological examination, defendant told Hulteng about his personal life, including his military experience and alcohol use, and he described his emotional state both before and after the shooting. Hulteng observed, "[Defendant] exhibits some depressive symptoms, which appear to be a reaction to his present circumstances." He also noted that, although defendant had been "exposed to traumatic events while in combat during the First Gulf War," the "diagnostic criteria for posttraumatic stress disorder do not appear to be met." Hulteng diagnosed defendant, under the *American Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR),[2] with three Axis I disorders: adjustment disorder with depressed mood; anxiety disorder, not

---

[2] The DSM-IV-TR is a reference work compiled by the American Psychiatric Association that categorizes mental disorders under a multi-axial assessment system. *See American Diagnostic and Statistical Manual of Mental Disorders* 27-30 (4th ed rev 2000).

otherwise specified; and alcohol abuse. He also diagnosed defendant with narcissistic personality traits under Axis II.

Hulteng also provided an opinion regarding the EED defense. He opined that, although there was no indication that defendant "suffered from a mental condition or cognitive impairment rendering him *inherently* incapable of controlling himself[,]" there were "indications that he was experiencing intense emotional distress." (Emphasis in original.) Hulteng noted that whether defendant's disturbance was reasonable from the standpoint of an ordinary person, as required under ORS 163.135 for the EED defense to apply, was a question of fact for a jury to decide.

Defendant was then examined by Dr. Duncan, first at the request of the state and then at defendant's request. In addition to speaking with defendant, Duncan reviewed Hulteng's report, defendant's history, and police reports. He described his findings in a written report. Duncan diagnosed defendant with two Axis I disorders: anxiety disorder, not otherwise specified; and alcohol abuse. Duncan also diagnosed defendant with Axis II obsessive-compulsive personality traits. Duncan explained that, "[b]ased on the totality of the data, it [was his] professional opinion that, at the time of the alleged murder of his wife Lisa on January 11, 2011, [defendant] was experiencing heightened stress, increased despair, and hopeless, catastrophic, and rigid thinking." Duncan also reported that, during both his and Hulteng's examinations of defendant, defendant

"endorsed anxiety symptoms associated with initial combat related trauma, including recurring nightmares, potential avoidance symptoms, and a heightened startle response. Although he does not appear to have full blown PTSD, [defendant's] ongoing anxiety symptoms during the days leading up to the alleged murder of his wife likely placed him at heightened risk for developing extreme distress."

Although Duncan stated that he could not "ethically opine on the ultimate EED issue because that is up to the jury or Judge to decide," it was his "professional opinion that [defendant] continued to exhibit signs of extreme distress, impaired judgment, and poor behavioral controls at the time of the alleged murder."

The state filed a motion *in limine* to limit Hulteng's and Duncan's expert testimony. Specifically, the state moved to exclude testimony about "defendant's anxiety, where it stems from, how it manifests, and how his additional personality traits factor into and affect his thinking." The state also moved to exclude testimony "regarding defendant's thought process or state of mind on the days surrounding the murder," and "whether his personality characteristics or traits put him at heightened risk for experiencing 'extreme distress.'" The state explained,

"An extensive examination of the development of the EED defense reveals that the determination for the 'reasonableness of the explanation for the disturbance' is to be made from the objective perspective of the 'ordinary' person: *i.e.,* not someone with defendant's personality traits, characteristics, or thought processes. The subjective component remains the actor's situation, or the events and circumstances leading up to the incident. To permit the defense to elicit the defendant's specific personality characteristics and traits would improperly remove the objective component that was purposefully retained by the legislature."

Defendant opposed the state's motion, arguing that the experts should be permitted to testify about "defendant's military history, defendant's mental disease or defect, the link between his military history and mental disease or defect, and the link between his mental disease or defect and his commission of the homicide." Defendant argued that evidence of his mental disorders did not "constitute evidence of a personality trait or characteristic" but, rather, should be "considered as a component of the actor's situation" and relevant to the subjective element of the EED defense. Defendant argued that the state's interpretation of the statute would "sanitize defendant and strip away any subjective factors that could prove to be favorable to his case."

The trial court granted the state's motion *in limine,* making the following findings and conclusions:

"1. Mental illness is not to be considered or elicited through expert testimony, with respect to any aspect or element of the EED defense.

"2.   Axis I and Axis II diagnoses should not be part of the EED defense and should not be utilized in the EED testimony. Specifically, Axis I diagnoses are not relevant to any aspect or element of the EED defense. Axis I diagnoses are not relevant to a) the 'actor's situation' under ORS 163.135; or b) the issue whether 'the disturbance is not the result of the person's own intentional, knowing, reckless or criminally negligent act' under ORS 163.135.

"3.   Personality disorders, traits and characteristics are to be excluded.

"4.   The *State v. Wille*, 317 Or 487[, 858 P2d 128] (1993), construct at page 497 in the opinion is appropriate to be used in this case where the expert may report facts that were provided to the expert primarily by the defendant that seem to present an extremely stressful situation for the defendant. Thus, although an expert may not provide testimony that defendant suffers from an Axis I or Axis II diagnosis, an expert may testify as to historical facts from defendant's past (e.g.—war zone deployment, exposure to graphic experiences and images attendant to that deployment), and how an ordinary person with those experiences would have found the circumstances at issue extremely stressful, and how those experiences may have impacted whether 'the disturbance is not the result of the person's own intentional, knowing, reckless, or criminally negligent act.'

"5.   The expert may give an opinion that an ordinary person operating under the facts as relayed by the defendant in that same situation would be stressed.

"6.   The defendant's beliefs and facts of his situation in life can be stated as in the *Wille* model.

"7.   Phrases such as rigid, obsessive, heightened risk, thought processes, impaired judgment, and poor behavioral controls are personal value judgments and do not meet the standard of a legal defense. Testimony shall not include whether the defendant was suffering from an 'extreme emotional disturbance.' Such phrases shall not be offered by an expert. Those phrases and that type of presentation by the expert witnesses would undercut the objective component which these cases clearly establish in Oregon law. The Legislature has determined that the objective criteria is very important to the EED construct."

Following the court's ruling, defendant entered a conditional guilty plea, reserving his right to appeal the trial court's ruling on the state's motion *in limine*. On appeal, defendant argues that evidence of his anxiety disorder is relevant to the subjective component of the EED defense— that is, to "the actor's situation." He argues that the trial court therefore erred in limiting Hulteng's and Duncan's expert testimony to exclude evidence of defendant's anxiety disorder.[3] The state reprises its argument that the expert testimony about defendant's anxiety disorder was properly excluded as irrelevant because "the actor's situation" does not encompass a defendant's personality traits, including evidence of mental illness.

Thus, the issue before us is one of statutory construction. Specifically, we must determine the meaning of the phrase "the actor's situation" and whether evidence of a defendant's anxiety disorder comes within it.

We begin with a brief discussion of the history of ORS 163.135 and, in particular, the history of the reasonableness standard in the statute, which was described in great detail in *State v. Ott*, 297 Or 375, 686 P2d 1001 (1984). Oregon's affirmative defense of EED constitutes a mitigating circumstance that reduces the crime of intentional murder to first-degree manslaughter. *See* ORS 163.118(1)(b). The defense requires proof that (1) "the homicide was committed under the influence of extreme emotional disturbance," (2) "the disturbance is not the result of the person's own intentional, knowing, reckless or criminally negligent act," and (3) "there is a reasonable explanation for the disturbance." ORS 163.135(1). "The reasonableness of the explanation for the disturbance must be determined from the standpoint of an ordinary person in the actor's situation under the circumstances that the actor reasonably believed them to be." *Id.* A defendant may present expert testimony in support of the defense only if he has given notice to the state of his intention to offer such testimony. ORS 163.135(2). After such notice is served, "the state may have at least one

---

[3] Although defendant was diagnosed with several mental disorders, his appeal focuses only on the trial court's decision to exclude evidence of defendant's diagnosis of an anxiety disorder.

psychiatrist or licensed psychologist of its selection examine the defendant in the same manner and subject to the same provisions as provided in ORS 161.315." ORS 163.135(5).

In *Ott*, the Supreme Court explained that Oregon's EED defense derived from the common-law "heat of passion" defense, which for centuries employed an entirely objective "reasonable man test" to determine whether a defendant was justifiably provoked to commit homicide. 297 Or at 381 ("[The reasonable man test] has been said to be an objective test, meaning that neither the mental nor physical peculiarities of the accused are evaluated in determining whether his loss of self-control was reasonable."). However, critics of the heat-of-passion defense observed that the reasonable man test was at odds with the more subjective concept of *mens rea. Id.* at 382. Among those critics were the drafters of the Model Penal Code, who sought to make the defense more subjective:

> " 'Though it is difficult to state a middle ground between a standard which ignores all individual peculiarities and one which makes emotional distress decisive regardless of the nature of its cause, we think that such a statement is essential. For surely if the actor had just suffered a traumatic injury, if he were blind or were distraught with grief, if he were experiencing an unanticipated reaction to a therapeutic drug, it would be deemed atrocious to appraise his crime for purposes of sentence without reference to any of these matters. They are material because they bear upon the inference as to the actor's character that it is fair to draw upon the basis of his act.' "

*Id.* at 385 (quoting Model Penal Code Tentative Draft No. 9 § 201.3, at 48).

The 1971 Oregon Criminal Law Revision Commission was "greatly influenced by the work of the drafters of the Model Penal Code." *Id.* at 386. However, the commission also recognized "a need for establishing a standard to fix an average conduct to protect the general welfare." *Id.* The commission "proposed to the Oregon legislature the Model Penal Code concept of viewing the matter from the standpoint of a person in the actor's situation." *Id.* at 395. The commission explained that that " 'requirement * * * inserts

some objectivity into a highly subjective standard,'" and noted that the "'old provocation formula [was] much too narrow; it [did] not recognize modern understanding of personalities.'" *Id.* at 387 (quoting Minutes, Senate Criminal Law & Procedure Committee, Feb 16, 1971, at 8-9 (testimony of George Platt)).

Ultimately, the legislature opted for a more objective test than the commission had proposed, thus requiring the jury to determine the reasonableness of the explanation for the disturbance "from the standpoint of an *ordinary person* in the actor's situation under the circumstances that the actor reasonably believed them to be." ORS 163.135 (emphasis added). As the Supreme Court explained in *Ott,*

"[t]he juxtaposition of these two requirements for determining the adequacy of the explanation prevents the adequacy from being determined on either wholly objective or subjective grounds. The words 'ordinary person' and 'reasonableness of the explanation' recall the reasonable man standard of the heat of passion defense, which is an objective test, while the requirement of taking into account the actor's situation suggests a more subjective analysis."

297 Or at 393-94. The current statute, therefore, considers both objective and subjective factors.

At issue in *Ott* was the propriety of jury instructions regarding the EED defense. Among other things, the jury had been instructed:

"[W]hen you consider the reasonableness of the explanation for an extreme emotional disturbance and its resulting homicidal act, you are not to use the defendant's scheme of moral values or the [d]efendant's personality characteristics. You may only use the scheme of moral values and personality characteristics which would be possessed by an ordinary person in our society today[.]"

*Id.* at 389. In discussing that portion of the jury instructions, the court drew a distinction between a defendant's *personal* characteristics—such as gender, sexual orientation, pregnancy, or physical disability—and a defendant's *personality* characteristics—such as bad temperament. *Id.* at 395. The court concluded:

"One must conclude that the Commission envisioned that the actor's situation included the actor's personal characteristics. A fair conclusion from the legislative treatment of the Commission's proposal is that the legislature was aware of this injection of subjectivity, yet the legislature made no change in that part of the Commission's proposal. The 1971 statute, originally and now, makes the test depend on the actor's situation. We have found nothing to indicate that this does not include those 'personal' characteristics noted by the drafters of the Model Penal Code."

*Id.* at 395-96 (footnote omitted). However, the court also concluded that the legislature did not intend for the actor's situation to extend to a defendant's *personality* characteristics because "such an interpretation would permit the acquittal of a bad-tempered person of murder and the conviction of an even-tempered person of murder in precisely the same situation and circumstances." *Id.* at 396 (internal quotation marks omitted); *see also Wille*, 317 Or at 499 (the trial court did not err in excluding expert testimony that the defendant suffered from a personality disorder because "the defendant's 'personality characteristics' or 'personality traits' are not relevant" to the actor's situation).

The Supreme Court revisited the meaning of the statutory phrase "the actor's situation" in *State v. Counts*, 311 Or 616, 816 P2d 1157 (1991). At issue in *Counts* was whether the affirmative defense of mental disease or defect under ORS 161.295[4] and the affirmative defense of EED are mutually exclusive. After recounting the legislative history of ORS 163.135, the court concluded that "the legislature did not intend that an individual's mental disease or defect (as defined by ORS 161.295) should be included within" the phrase "the actor's situation." *Counts*,

---

[4] ORS 161.295 provides:

"(1) A person is guilty except for insanity if, as a result of mental disease or defect at the time of engaging in criminal conduct, the person lacks substantial capacity either to appreciate the criminality of the conduct or to conform the conduct to the requirements of law.

"(2) As used in chapter 743, Oregon Laws 1971, the terms 'mental disease or defect' do not include abnormality manifested only by repeated criminal or otherwise antisocial conduct, nor do they include any abnormality constituting solely a personality disorder."

311 Or at 628. The court explained, "To take such a factor into account would eliminate the objective checks intentionally maintained in the defense. What circumstance, for example, would not be reasonable as viewed from the standpoint of an 'ordinary insane person?'" *Id.* However, the court's focus was solely on the mental disease or defect contemplated by ORS 161.295(1)—*viz.*, insanity. The court left open the "issue as to whether lesser mental infirmities may be taken into account in the 'actor's situation.'" 311 Or at 628 n 13.

We turn to the question at issue here, which is whether evidence of defendant's diagnosis of anxiety disorder is relevant to the "actor's situation" and, thus, admissible to support his defense of EED. Defendant contends that a diagnosis of anxiety disorder is a personal characteristic akin to a person's age, gender, or physical disability. Thus, defendant argues, it is relevant to "the actor's situation" and should not have been excluded. The state argues that, to the contrary, the "actor's situation" does not encompass a defendant's "personality characteristics or thought processes" but concerns only "the events and circumstances that led up to the homicide." The state urges that "[t]o conclude otherwise would eliminate the objective component that the legislature expressly chose to retain." We agree with defendant for several reasons.

First, defendant's diagnosis of anxiety disorder more closely resembles the personal characteristics that the legislature intended to be relevant to "the actor's situation" than it does to the type of personality traits that the Supreme Court has concluded are irrelevant to the EED defense. Anxiety disorder, not otherwise specified, is categorized in the DSM-IV-TR under Axis I, which includes mental disorders and other conditions that may be a focus of clinical attention. DSM-IV-TR at 27. Like schizophrenia, eating disorders, and at least some other Axis I clinical disorders, anxiety disorder is a condition that can involve acute symptoms and that is susceptible to psychological and medical treatment. Defendant's anxiety disorder, as explained in this case, bears a closer resemblance to physical illness or disability than it does to nonclinical

personality traits like ill temperament, dishonesty, or stubbornness.[5]

The state argues that this case presents the same type of evidence deemed inadmissible in *Wille*. However, the evidence sought to be admitted in *Wille* was that the defendant suffered from a *personality* disorder. 317 Or at 496. The trial court excluded that evidence on the basis that the diagnosis would have been "'intertwined'" with evidence of the defendant's personality traits, which were deemed irrelevant to the EED defense in *Ott*. *Id*. In affirming that ruling, the Supreme Court characterized the trial court's ruling as excluding evidence of the defendant's *personality* traits. *Id*. at 497. The evidence here is unlike the proffered evidence in *Wille*. Personality disorders—like narcissistic, antisocial, or borderline personality disorder—are coded in the DSM-IV-TR under Axis II and are expressly distinguished from Axis I clinical disorders like defendant's anxiety disorder. We have observed that personality disorders "are more resistant to treatment than Axis I disorders because Axis II disorders generally involve a more enduring and pervasive set of maladaptive behaviors, perceptions, and beliefs." *State ex rel Dept. of Human Services v. R. N. L.*, 218 Or App 188, 192 n 3, 180 P3d 704 (2008). Here, defendant did not offer expert testimony that would be inextricably intertwined with evidence of his personality. That is, the testimony offered by defendant was not about an "enduring and pervasive set of maladaptive behaviors, perceptions, and beliefs." Rather, defendant offered expert testimony regarding how his Axis I anxiety disorder contributed to his experience of "heightened stress," "increased despair," and "rigid thinking" at the time of the shooting. Thus, it is distinguishable from the testimony deemed irrelevant in *Wille*.

Second, contrary to the state's view, nothing in the text, context, or legislative history of ORS 163.135 indicates that the actor's situation is limited to the events and circumstances leading up to the homicide. As already discussed,

---

[5] By our holding, we do not suggest that all Axis I diagnoses fit into this analytical framework and are automatically admissible as relevant to a defense of EED. Rather, our analysis concerns the diagnosis of Axis I anxiety disorder that was offered in this case.

personal characteristics, such as gender, age, and physical disability, are relevant to the actor's situation. *Ott*, 297 Or at 395-96. Subsections (2) and (5) of the statute also support the conclusion that the legislature intended the actor's situation to encompass more than just external circumstances. ORS 163.135(2) requires a defendant seeking to present expert testimony in support of an EED defense to provide notice to the state. After such notice is served, "the state may have at least one psychiatrist or licensed psychologist of its selection examine the defendant in the same manner and subject to the same provisions as provided in ORS 161.315." ORS 163.135(5). Those provisions indicate that the legislature contemplated the admission of expert psychological and psychiatric evidence on the EED defense, much like the expert evidence admitted to support an insanity defense. *See also State ex rel Johnson v. Woodrich*, 279 Or 31, 35, 566 P2d 859 (1977) (discussing the state's right to a psychiatric examination of a defendant seeking to plead not guilty by reason of insanity or to introduce expert testimony on EED: "It was neither our intent nor that of the legislature to attempt to undercut the constitutional privilege against self-incrimination. It was our intent to make the best use of modern psychiatric expertise consistent with the privilege as we understand it." (Footnote omitted.))

The state acknowledges that ORS 163.135 contemplates the admission of expert psychological testimony but argues that the legislature did not intend to allow that testimony to extend to evidence of mental illness. Once again, the state attempts to draw a parallel between this case and *Wille*. In *Wille*, the Supreme Court noted that the trial court had not excluded the expert testimony in its entirety; rather the court had merely precluded the expert from testifying about (1) the defendant's personality traits, (2) his opinion that the murder was or was not an intentional act, and (3) his opinion that the defendant had acted under extreme emotional disturbance. 317 Or at 497. The court observed that the expert was not barred from providing other testimony, such as the defendant's account of what happened, the expert's opinion that the circumstances leading up to the homicide (including the defendant's impending divorce and financial problems) presented an extremely stressful

situation for the defendant, and the expert's opinion that an ordinary person would have found those circumstances very stressful as well. *Id.* at 498.

We are not persuaded that the court's observations regarding the *scope* of the trial court's ruling in *Wille* support a conclusion that the legislature intended to limit expert psychological testimony to the subjects identified in *Wille*. To confine expert testimony to the defendant's statements and to opinions on the defendant's level of stress would arguably eliminate the need for expert psychological testimony altogether. *See* OEC 702 ("If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise."). We therefore conclude that the actor's situation encompasses more than simply the events and circumstances that the defendant faced before the homicide.

Third, we reject the state's argument that admitting evidence of a diagnosis of anxiety disorder eliminates the objective component of the EED defense. As the Supreme Court explained in *Ott*, the legislature intended ORS 163.135 to encompass both subjective and objective considerations: "The words 'ordinary person' and 'reasonableness of the explanation' recall the reasonable man standard of the heat of passion defense, which is an objective test, while the requirement of taking into account the actor's situation suggests a more subjective analysis." 297 Or at 393-94. We see no reason to conclude that evidence of a defendant's anxiety disorder is incompatible with this hybrid approach. Just as a jury is capable of determining reasonableness from the standpoint of an ordinary blind person, a jury is capable of determining reasonableness from the standpoint of an ordinary person suffering from an anxiety disorder, as explained through expert psychological evidence.

We therefore conclude that evidence of defendant's anxiety disorder is relevant to the affirmative defense of EED under ORS 163.135. Thus, the trial court erred in

limiting the expert testimony to exclude evidence of defendant's diagnosis of an anxiety disorder.

Reversed and remanded.