Argued and submitted March 3, decision of the Court of Appeals affirmed, in part on different grounds; judgment of the circuit court as to conviction affirmed, sentence vacated, and case remanded to the circuit court for resentencing September 2, 1993

# STATE OF OREGON,
*Respondent on Review/*
*Petitioner on Review,*

*v.*

# MICHAEL PAUL WILLE,
*Petitioner on Review/*
*Respondent on Review.*

## (CC C890382CR; CA A62688;
## SC S39650, S39844)

858 P2d 128

Eric R. Johansen, Deputy Public Defender, Salem, argued the cause for petitioner on review/respondent on review Wille. Also on the petition was Sally Avera, Public Defender, Salem.

Janet A. Metcalf, Assistant Attorney General, Salem, argued the cause for respondent on review/petitioner on review State of Oregon. With her on the petition were Charles S. Crookham, Attorney General, and Virginia L. Linder, Solicitor General, Salem. Also on the response were Theodore R. Kulongoski, Attorney General, Virginia L. Linder, Solicitor General, and Brenda J Peterson, Janet A. Klapstein, and Diane S. Lefkow, Assistant Attorneys General, Salem.

CARSON, C. J.

**CARSON, C. J.**

Defendant was convicted of the aggravated murder of his estranged wife. He was sentenced to life imprisonment without possibility of parole, as provided in ORS 163.105(1)(b). On appeal, the Court of Appeals affirmed that conviction, vacated convictions for lesser-included offenses related to the underlying felonies,[1] and remanded the case to the circuit court for resentencing to life imprisonment rather than life imprisonment without possibility of parole. *State v. Wille*, 115 Or App 47, 839 P2d 712 (1992). Both defendant and the state petitioned for review. We allowed defendant's petition to consider issues related to the affirmative defense of extreme emotional disturbance. We allowed the state's petition to consider sentencing issues. On review, we affirm the decision of the Court of Appeals, in part on different grounds.

The facts as summarized by the Court of Appeals are not disputed:

"Defendant was very upset that his wife had filed for a dissolution. She was living with her mother and had obtained a temporary restraining order preventing him from entering her residence. After she filed the dissolution action, defendant told a number of people that he wanted to kill her. On February 23, 1989, he told an acquaintance from work that he should have done to his wife what he had planned to do in the first place, and he made a stabbing motion. Early that evening, defendant called his wife, who told him that she did not want to talk and hung up. He returned to work and, from there, called a friend and said that he wanted to go kill his wife. Defendant left work about 9:00 p.m. and went to his wife's residence. He kicked the door in, went in and said, 'This is it.' He then grabbed her and pulled her out of the house.

"About 9:30 p.m., a neighbor heard a loud noise on his deck. Defendant and his wife, both covered with blood, burst through his back door. The neighbor attempted to push them out, but defendant stabbed his wife a couple of times before the neighbor managed to push him out the door and shut it. The neighbor then called 911. Another neighbor heard the commotion, came over and saw defendant slumped against a

---

[1] The propriety of the Court of Appeals' vacating defendant's convictions of burglary in the first degree and kidnapping in the second degree is not before the court.

tree with deep cuts on his wrist. Defendant told him, 'Don't worry about me * * * go check on my wife * * * I have just stabbed my wife * * * I have just killed my wife.' The sheriff arrived, saw defendant, then entered the house and found defendant's wife dead. The medical examiner determined that she had died from a stab wound to her heart.

"Defendant was charged with three counts of aggravated murder, with underlying crimes of one count of kidnapping in the second degree and two counts of burglary in the first degree. His entire defense to the murder charge was that he lacked the requisite mental state to support a conviction for murder. He filed a notice of intent to rely on EED as a partial defense. ORS 163.118(1)(b); ORS 163.135(1).[2] He pled not guilty and was tried by a jury. The trial court advised the jury that the EED defense could reduce the crime of intentional murder to manslaughter in the first degree, but that the defense did not apply to the felony murder or aggravated murder charges. Defendant was found guilty of all offenses charged in the indictment." *State v. Wille, supra*, 115 Or App at 49-50.

We first examine the issues raised by defendant's petition for review.

### DEFENSE OF EXTREME EMOTIONAL DISTURBANCE

Defendant contends that the trial court improperly instructed the jury about the affirmative defense of extreme emotional disturbance (EED)[3] and erroneously excluded testimony by defendant's expert witness related to EED.

---

[2] ORS 163.118(1) provides, in part:

"Criminal homicide constitutes manslaughter in the first degree when:

"* * * * *

"(b) It is committed intentionally by a defendant under the influence of extreme emotional disturbance as provided in ORS 163.135. The fact that the homicide was committed under the influence of extreme emotional disturbance constitutes a mitigating circumstance reducing the homicide which would otherwise be murder to manslaughter in the first degree and need not be proved in any prosecution."

The text of ORS 163.135(1) is set out in note 3, below.

[3] ORS 163.135(1) provides:

"It is an affirmative defense to murder * * * that the homicide was committed under the influence of extreme emotional disturbance when such disturbance is not the result of the person's own intentional, knowing, reckless or criminally negligent act, and for which disturbance there is a reasonable explanation. The reasonableness of the explanation for the disturbance shall be determined from the standpoint of an ordinary person in the actor's situation

## A. *Jury Instructions.*

Defendant's first challenge is to the trial court's jury instructions concerning the EED defense. The trial court instructed the jury that defendant had raised the defense of extreme emotional disturbance and that the EED defense, if proved by a preponderance of the evidence, would reduce an intentional homicide that otherwise would constitute murder to manslaughter in the first degree. The court further instructed the jury that the EED defense applied only to the lesser-included offense of intentional murder, but not to the charge of aggravated felony murder or to the lesser-included offense of felony murder. Defendant excepted to those instructions, arguing that EED is a defense to aggravated felony murder.

### 1. *Aggravated Murder.*

■ The Court of Appeals concluded that, because the jury determined by special verdict that defendant had not made out the affirmative defense, the court did not need to reach the question whether EED can be asserted as a defense to a charge of aggravated murder. 115 Or App at 51-52. The Court of Appeals later answered the question that it left open in this case. In *State v. Hessel*, 117 Or App 113, 119, 844 P2d 209 (1992),[4] that court held that EED is *not* a defense to aggravated murder.

If, as defendant argues, the trial court committed prejudicial error in limiting expert testimony about his asserted EED defense and in instructing the jury on that defense, then the jury's special verdict rejecting the EED defense would not resolve the claim of error. For that reason,

---

under the circumstances as the actor reasonably believes them to be. Extreme emotional disturbance does not constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime."

[4] On July 16, 1993, this court issued an order withholding action on the petition for review in *State v. Hessel*, 117 Or App 113, 844 P2d 209 (1992), pending a decision in *State v. Wille*. This court's practice formerly was to advise counsel by letter if a petition for review were being held in abeyance pending a decision in another case in which the court already had allowed review. Henceforward, the court will issue an order to that effect, as it did in *State v. Hessel*. The court will publish the order in the Advance Sheets on the page reserved for "Court Actions" and also will publish a running list of petitions for review held for decision in other cases in the section of the Advance Sheets devoted to a list of "Petitions for Review Pending/Held."

and because this issue already has recurred and been addressed in *Hessel*, we address the ultimate question: Was defendant entitled to present an EED defense to the crime of aggravated felony murder?

The legislature has answered that question plainly. EED is a defense to the crime of intentional murder, and to no other crime:

> "It is an affirmative defense to murder for purposes of ORS 163.115(1)(a) that the homicide was committed under the influence of extreme emotional disturbance * * *. *Extreme emotional disturbance does not constitute a defense to a prosecution for, or preclude a conviction of, * * * any other crime.*" ORS 163.135(1). (Emphasis added.)

Aggravated felony murder is a different crime than intentional murder; therefore, under ORS 163.135(1), extreme emotional disturbance is *not* a defense to aggravated felony murder. The trial court correctly instructed the jury that EED is not a defense to aggravated felony murder.

### 2. *Intentional Murder*.

■ The trial court also was correct in instructing the jury that EED *is* a defense to the lesser-included offense of intentional murder, because intentional murder is a lesser-included offense of aggravated murder and EED is a defense to intentional murder. ORS 163.115(1) defines murder as criminal homicide:

> "(a) When it is committed intentionally, except that it is an affirmative defense that, at the time of the homicide, the defendant was under the influence of an extreme emotional disturbance;
>
> "(b) When it is committed by a person, acting either alone or with one or more persons, who commits or attempts to commit any of the following crimes and in the course of and in furtherance of the crime the person is committing or attempting to commit, or during the immediate flight therefrom, the person, or another participant if there be any, causes the death of a person other than one of the participants:
>
> "(A) Arson in the first degree * * *;
>
> "(B) Criminal mischief in the first degree by means of an explosive * * *;

"(C) Burglary in the first degree * * *;

"(D) Escape in the first degree * * *;

"(E) Kidnapping in the second degree * * *;

"(F) Kidnapping in the first degree * * *;

"(G) Robbery in the first degree * * *;

"(H) Any felony sexual offense in the first degree * * *; or

"(I) Compelling prostitution * * *; or

"(c) [Murder by abuse of a child under 14 years of age]."

When we use the term "intentional murder," we refer to the crime defined in ORS 163.115(1)(a). We refer to ORS 163.115(1)(b) as "felony murder."

■ Aggravated murder is defined in ORS 163.095 as "murder as defined in ORS 163.115 which is committed under, or accompanied by, any of the following circumstances." The statute goes on to list 17 separate aggravating circumstances. A conviction must be based on jury findings of murder, ORS 163.115, plus all the elements of an aggravating circumstance. *State v. Boots*, 308 Or 371, 780 P2d 725 (1989).

Defendant was charged under ORS 163.095(2)(d),[5] a category commonly called "aggravated felony murder." The 16 other possible aggravating circumstances relate specifically to aggravation of an underlying crime of intentional murder, as defined by ORS 163.115(1)(a). In contrast, the underlying crime of aggravated felony murder is *felony* murder, as defined by ORS 163.115(1)(b), but, the aggravating circumstance is that a defendant committed the homicide "personally and *intentionally.*" ORS 163.095(2)(d). (Emphasis added.)

The legislature has defined the term "intentionally" in the criminal code to mean "with a conscious objective to cause the result or to engage in the conduct" described by a

---

[5] The aggravating circumstance is defined this way in ORS 163.095(2)(d):

"Notwithstanding ORS 163.115(1)(b), the defendant personally and intentionally committed the homicide under the circumstances set forth in ORS 163.115(1)(b)."

ORS 163.115(1)(b) is set out in text above.

statute defining an offense. ORS 161.085(7). Because there is no special definition of "intentionally" in either ORS 163.115(1)(a) (intentional murder) or ORS 163.095(2)(d) (aggravated felony murder), "intentionally" in both of those statutes has the meaning given in ORS 161.085(7). ORS 161.085.

■ Aggravated murder, then, may be defined as a murder that is committed "intentionally," plus something more. In that sense, intentional murder necessarily is a lesser-included offense of aggravated murder. We stated as much in *State v. Isom*, 313 Or 391, 407, 837 P2d 491 (1992) ("The crime of intentional murder is 'necessarily included' in the crime of aggravated murder.").

■ Generally, a jury may find a defendant guilty of any lesser-included offense. ORS 136.465.[6] However, a defendant is not entitled to a jury instruction on a lesser-included offense unless there is evidence from which a jury "could rationally find guilt of a lesser [included] offense and no guilt of the offense charged." *State v. White*, 303 Or 333, 347, 736 P2d 552 (1987). Applying ORS 136.465 as interpreted by *State v. White, supra*, in *State v. Isom, supra*, 313 Or at 407-08, this court determined that no lesser-included offense instruction on intentional murder was warranted when there was no dispute as to the existence of the aggravating factor (defendant's status as an escapee). A similar conclusion was reached in *State v. Farrar*, 309 Or 132, 167-68, 786 P2d 161 (1990), where the evidence of the murder and of the underlying felonies (burglary of the victim's home and robbery of the victim) was essentially undisputed.

■ In summary, if intentional murder is factually a lesser-included offense to a given charge of aggravated felony murder, then a defendant is entitled to an instruction on intentional murder, and the jury has the option of finding the defendant guilty of intentional murder. As noted above, EED is a defense to intentional murder. That is so even if intentional murder is before the jury as a lesser-included offense,

---

[6] ORS 136.465 provides:

"In all cases, the defendant may be found guilty of any crime the commission of which is necessarily included in that with which the defendant is charged in the accusatory instrument or of an attempt to commit such crime."

rather than as a separately charged crime, and even though EED is not a defense to aggravated felony murder.

■ In *this* case, the offense of intentional murder *was* a jury consideration. The accusatory instrument[7] charged in three counts that the defendant "did personally and intentionally cause the death of another human being." The trial judge instructed the jury that intentional murder was a lesser-included offense and gave an instruction concerning the elements of intentional murder. In addition, there was evidence from which a jury rationally could find that defendant was not guilty of aggravated felony murder, but was guilty of intentional murder (as to which EED is a defense). Accordingly, we next consider whether there was evidentiary error related to the EED defense.

### B. *Evidentiary Issues.*

Mid-trial, before defense counsel gave an opening statement,[8] the prosecutor raised some preliminary objections concerning certain evidence that the defense intended to introduce. Two areas of objection involved the anticipated testimony of Dr. Norman Janzer, a psychiatrist, who had examined defendant before trial and whom defendant proposed to call as an expert witness. Defendant sought to call Dr. Janzer to support defendant's claim of partial amnesia concerning the crime and to prove that defendant had been acting under the influence of extreme emotional disturbance when he killed his wife.

### 1. *Amnesia.*

■ As noted, in the middle of trial, the prosecutor asked the trial court to rule on a "motion *in limine*" that would have limited the testimony of defendant's psychiatric expert, Dr. Janzer. The prosecutor objected to the *manner* in which the doctor apparently was going to discuss the fact that the defendant claimed to be amnesic as to the events surrounding

---

[7] A lesser-included offense is one that is included either in the statutory framework defining the greater and lesser offenses or in the accusatory instrument itself. *State v. Washington*, 273 Or 829, 836, 543 P2d 1058 (1975).

[8] Defense counsel reserved opening statement until the conclusion of the state's case-in-chief.

his wife's death.[9] The trial judge made a narrow ruling that granted the prosecution's motion, to which defendant now objects.

Further recitation of the facts surrounding this issue would not benefit bench or bar. On a full review of the evidence in this record, we conclude that the trial court's error — if any — was harmless.

## 2. *Extreme Emotional Disturbance.*

As explained above, the defense called Dr. Janzer to testify in an offer of proof concerning the EED defense. At the conclusion of the offer of proof, the prosecutor told the court that, although he did not "care about most of [the doctor's] testimony," he objected to the doctor's "opinion as to whether or not the defendant was acting under the influence of an extreme emotional disturbance" or whether defendant suffered from a personality disorder. After hearing argument from both parties, the trial court ruled:

"And on the extreme emotional disturbance, it's the Oregon Supreme Court which states that the personality traits cannot be considered of the defendant by the jury. To me, if they're intertwined, that means they're excludable. And that means to me also that the doctor cannot testify either as to whether it was an intentional act or not, and he cannot testify that the defendant suffered from extreme emotional disturbance.

"That's my ruling. He can testify to anything else. What the value of that is [is] something for counsel to evaluate.

"But you understand, Doctor, in case you're called upon to testify in front of the jury, what my ruling is. In effect, I'm saying you can't tell the jury whether it was an intentional act or not, or what his state of mind was. And, secondly, you cannot opine or render an opinion as to whether this defendant is suffering from an extreme emotional disturbance. Because to do so would bring into play those factors which are precluded either by the Supreme Court or the legislature."

---

[9] We say "apparently" because, as to this issue, the entire discussion was confined to one sentence in a written report of Dr. Janzer's. The doctor did not testify in an offer of proof as to this issue, and defendant did not make any other form of offer of proof as to what the doctor's full testimony on this topic would be.

Thereafter, the court asked the prosecutor whether he understood the ruling, to which the prosecutor replied:

"Yes. I understand it. There cannot be a question posed to him, 'Do you have an opinion as to whether or not this defendant acted with intent or intentionally?' And, secondly, he cannot be asked whether or not the defendant suffered from an extreme emotional disturbance as has been defined by *State v. Ott*[, 297 Or 375, 686 P2d 1001 (1984),] and by the legislature. He can testify about anything else though."

After that summary, the court said, "That's it."

Defendant elected not to call Dr. Janzer as a witness. Defendant's argument, that "[t]he trial court's actions *in precluding Dr. Janzer from testifying* resulted in defendant['s] being precluded from presenting a defense" (emphasis added), overstates the trial court's rulings. The trial court ruled that Dr. Janzer could not testify about three things:

(a) defendant's personality traits;

(b) an opinion that the murder was or was not an intentional act; and

(c) an opinion that defendant acted under "extreme emotional disturbance."

As noted, the court expressly ruled that Dr. Janzer "can testify to anything else." The offer of proof demonstrated that, indeed, Dr. Janzer's proposed testimony covered additional topics that might have advanced the EED defense. For example, Dr. Janzer related the history that defendant had given him; concluded that the events leading up to the murder, including his impending divorce and financial problems, presented "an extremely stressful situation for [defendant]"; testified that "an ordinary person would have found it very stressful" as well; and observed that the version of events related by defendant during the psychiatric examination was similar to the statements in the witnesses' reports that the doctor had reviewed. Because the trial court's rulings were not the equivalent of precluding the doctor from testifying, we consider only those specific rulings and not defendant's broader challenge that he was precluded from presenting a defense.

### (a) *Personality Traits.*

■ We turn to whether the trial court erred in ruling that Dr. Janzer was precluded, in his testimony related to defendant's EED defense, from testifying as to defendant's "personality traits." ORS 163.135(1) provides, in part:

> "It is an affirmative defense to murder for purposes of ORS 163.115(1)(a) that the homicide was committed under the influence of extreme emotional disturbance when such disturbance is not the result of the person's own intentional, knowing, reckless or criminally negligent act, and for which disturbance there is a reasonable explanation. *The reasonableness of the explanation for the disturbance shall be determined from the standpoint of an ordinary person in the actor's situation under the circumstances as the actor reasonably believes them to be."* (Emphasis added.)

This court considered the meaning of ORS 163.135 in *State v. Ott*, 297 Or 375, 686 P2d 1001 (1984), in the context of deciding what jury instructions should be given relating to that defense. The court explained that the defense derived from the traditional defense of "heat of passion," *id.* at 380, and reviewed the legislative history of the Oregon provision, including the legislature's consideration of the work of the Criminal Law Revision Commission and of the drafters of the Model Penal Code, *id.* at 380-87. The court explained that, as enacted, ORS 163.135 requires the trier of fact to consider both objective and subjective factors:

> "[T]he Oregon statute requires that the 'reasonableness of the explanation for the disturbance shall be determined from the standpoint of an ordinary person,' ORS 163.135(1). On the other hand, the statute requires that the reasonableness of the interpretation must be judged from the standpoint of 'the actor's situation under the circumstances as the actor reasonably believes them to be.' The juxtaposition of these two requirements for determining the adequacy of the explanation prevents the adequacy from being determined on either wholly objective or subjective grounds. The words 'ordinary person' and 'reasonableness of the explanation' recall the reasonable man standard of the heat of passion defense, which is an objective test, while the requirement of taking into account the actor's situation suggests a more subjective analysis.
>
> "* * * * *

"* * * [T]he [Criminal Law Revision] Commission proposed to the Oregon legislature the Model Penal Code concept of viewing the matter from the standpoint of a person in the actor's situation. One must conclude that the Commission envisioned that the actor's situation included the actor's personal characteristics. A fair conclusion from the legislative treatment of the Commission's proposal is that the legislature was aware of this injection of subjectivity, yet the legislature made no change in that part of the Commission's proposal. The 1971 statute, originally and now, makes the test depend upon the actor's situation. We have found nothing to indicate that this does not include those *'personal'* characteristics noted by the drafters of the Model Penal Code." *Id*. at 393-96. (Emphasis added; footnote omitted.)

Nevertheless, the *Ott* court concluded that the *"personality* characteristics" of the defendant in that case were not to be considered by the jury. The court explained:

"Defendant argued that 'personality characteristics' are a part of the actor's personal characteristics and thus of the actor's 'situation' that must be taken into account in determining reasonableness.

"The state answered that there is nothing in the legislative history * * * to suggest that *personality traits* are properly to be considered. As the state argues, such an interpretation would permit the acquittal of a bad-tempered person of murder and the conviction of an even-tempered person of murder in 'precisely the same situation and circumstances.' We agree." *Id*. at 396. (Emphasis added.)

In summary, this court has established that, in determining whether a defendant has acted under the influence of an extreme emotional disturbance, ORS 163.135, the defendant's "personality characteristics" or "personality traits" are not relevant. The trial court did not err in excluding Dr. Janzer's testimony concerning defendant's personality traits.

(b) *Opinions on Intent and EED.*

We next consider whether the trial court erred in excluding Dr. Janzer's opinions as to whether defendant's act in killing his wife was "intentional" and as to whether defendant in fact acted under the influence of "extreme emotional disturbance."

OEC 704 provides:

"Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."

OEC 704 does not provide that an opinion embracing an ultimate issue to be decided by the trier of fact is admissible; rather, it states that such an opinion is not objectionable solely for the reason that it embraces an ultimate issue. An opinion still may be objectionable on other grounds.

The commentary to OEC 704 (adopting the commentary to the identical federal rule) observes that:

"The abolition of the [prohibition on testimony regarding an ultimate issue] does not lower the bars so as to admit all opinions. Under Rule[s] 701 and 702, opinions must be helpful to the trier of fact, and [under Rule 403 they must not unfairly prejudice, confuse or delay the proceedings]. These provisions * * * stand ready to exclude opinions phrased in terms of inadequately explored legal criteria. Thus the question, 'Did T[estator] have capacity to make a will?' would be excluded, while the question, 'Did T[estator] have sufficient mental capacity to know the nature and extent of his property and the natural objects of his bounty and to formulate a rational scheme of distribution?' would be allowed. McCormick § 12." L. Kirkpatrick, Oregon Evidence 466-67 (2d ed 1989) (third bracket in original).

The commentary to the Oregon Evidence Code, while not binding on this court, provides useful guidance as to legislative intent. *State v. Phillips*, 314 Or 460, 468 n 9, 840 P2d 666 (1992).

Here, we conclude that opinions as to whether defendant killed his wife "intentionally" and as to whether defendant acted under the influence of "extreme emotional disturbance" are, in the words of the commentary to OEC 704, "opinions phrased in terms of inadequately explored legal criteria." The terms "intentional" and "extreme emotional disturbance" are statutorily defined legal terms[10] whose meanings may or may not coincide with the meanings

---

[10] ORS 161.085(7), defining "intentional," is quoted, in part, at note 5, above; ORS 163.135(1), establishing the requirements of the defense of "extreme emotional disturbance," is quoted, in part, at page 498, above.

that a medical professional or lay person otherwise would give them.

*Banta v. Leffler,* 204 Or 538, 284 P2d 348 (1955), presented the example alluded to in the commentary to OEC 704 and further supports our conclusion in this regard. In that case, this court held:

> "We have on numerous occasions stated, and correctly so, that it is improper for a witness to give his opinion 'that the testator had capacity to make a will, * * *, for that is the identical problem before the court.' * * * [T]he vice of permitting this conclusion of the witness to be given is * * * that it assumes a witness is fully conversant with the requisite mental capacity necessary to make a will; thus there is presented to the witness a question of law as well as a question of fact, and the unknowing witness is left to fix his own standard of mental capacity to make a will." *Id.* at 545. (Citations omitted.)

As in *Banta v. Leffler, supra,* testimony by Dr. Janzer in respect to whether defendant's act in killing his wife was "intentional" and whether he acted under the influence of "extreme emotional disturbance" constituted testimony in respect to "a question of law as well as a question of fact."

For the above reasons, the trial court did not err in excluding Dr. Janzer's opinions on intention and extreme emotional disturbance.

### THE "TRUE LIFE" SENTENCE

Having addressed the issues raised by defendant's petition for review, we turn to the issue raised by the state's petition. The state contends that the Court of Appeals erred in remanding this case for resentencing on the ground that the sentence imposed on defendant, life in prison without possibility of parole, violated constitutional guarantees against *ex post facto* laws.

*Ex post facto* laws are the subject of Article I, section 21, of the Oregon Constitution, and Article I, section 10, of the Constitution of the United States.[11] As has been our

---

[11] Article I, section 21, of the Oregon Constitution provides, in part:

"No *ex post facto* law * * * shall ever be passed * * *."

Article I, section 10, of the Constitution of the United States provides, in part:

practice, we construe these particular state and federal provisions without distinguishing them. *See State v. Gallant*, 307 Or 152, 764 P2d 920 (1988) (applying joint analysis).

 The prohibition against *ex post facto* laws applies to substantive changes in criminal law and sentencing that are applied retroactively. This court's summary of the prohibition was stated in *State v. Gallant, supra*, 307 Or at 155: "Generally speaking, *ex post facto* laws punish acts that were legal at the time they occurred, [increase] the punishment for [criminal] acts, or deprive the defendant of a defense for those acts."

In a recent opinion applying the federal *Ex Post Facto* Clause, the Supreme Court of the United States noted that the term "*ex post facto* law" is a term of art, the established meaning of which predates the framing of the Constitution of the United States. *Collins v. Youngblood*, 497 US 37, 41, 110 S Ct 2715, 111 L Ed 2d 30 (1990). The Court explained the meaning of the *Ex Post Facto* Clause as follows:

> " 'It is settled, by decisions of this Court so well known that their citation may be dispensed with, that any statute which punishes as a crime an act previously committed, which was innocent when done; which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime of any defense available according to law at the time when the act was committed, is prohibited as ex post facto.' " *Id*. at 42 (quoting *Beazell v. Ohio*, 269 US 167, 169-70, 46 S Ct 68, 70 L Ed 216 (1925)).

In summary, the Court stated, "[l]egislatures may not retroactively alter the definition of crimes or increase the punishment for criminal acts." *Id*. at 42.

The sentence imposed on defendant in this case was established by an amendment to ORS 163.150. That amendment was enacted in 1989, that is, after defendant committed the crime, but before his trial. Or Laws 1989, ch 720, § 2. There is no question that the amended law was applied retroactively to defendant.

The sole question before us is whether the amendment *increased* the punishment for aggravated murder. The

---

"No State shall * * * pass any * * * ex post facto Law * * *."

Court of Appeals concluded that it did. *State v. Wille, supra*, 115 Or App at 59. As noted above, punishment is increased, and a law is an *ex post facto* violation, if the law "makes more burdensome the punishment for a crime, after its commission." *Collins v. Youngblood, supra*, 497 US at 42.

The crux of our analysis of whether the punishment became more burdensome in this case lies in comparing the sentencing structure for aggravated murder in effect when defendant's crime was committed with the structure in effect when he was sentenced.

In February 1989, when defendant killed the victim, there were two sentencing options for those convicted of aggravated murder. A jury could make findings requiring a defendant to be sentenced to death; if it did not, the trial judge was required to impose a sentence of life imprisonment, statutorily defined as imprisonment for a minimum of 30 years.[12] The 1989 legislature enacted a third sentencing option, that of life imprisonment without possibility of parole.[13] For purposes of this opinion, we refer to the original life imprisonment sentence as "ordinary life" and the new sentence as "true life."

 Under the 1989 amendment, true life is the presumptive sentence when a jury does not return findings

---

[12] ORS 163.150(1)(e) (1987) provided, in part:

"If the jury returns a negative finding on any issue submitted under this section, the trial judge shall sentence the defendant to imprisonment for life in the custody of the Department of Corrections as provided in ORS 163.105."

ORS 163.105(1)(c) (formerly ORS 163.105(1) (1987)) describes that sentence:

"If sentenced to life imprisonment, the court shall order that the defendant shall be confined for a minimum of 30 years without possibility of parole, release on work release or any form of temporary leave or employment at a forest or work camp."

That sentence includes a possibility of parole after 20 years for prisoners who establish that they are likely to be rehabilitated within a reasonable period of time. ORS 163.105(2).

[13] The new sentence is defined in ORS 163.105(1)(b):

"A person sentenced to life imprisonment without the possibility of release or parole under this section shall not have that sentence suspended, deferred or commuted by any judicial officer, and the State Board of Parole and Post-Prison Supervision may not parole the prisoner nor reduce the period of confinement in any manner whatsoever. The Department of Corrections or any executive official may not permit the prisoner to participate in any sort of release or furlough program."

supporting the death penalty; since the amendment, ordinary life may be imposed only when 10 members of the jury agree that there are sufficient mitigating circumstances. ORS 163.150(2)(a).[14]

In summary, at the time of defendant's crime, a jury that had convicted a defendant of aggravated murder was to answer three statutory questions regarding the applicability of the death penalty. If the jury unanimously answered all the questions affirmatively, the trial court was required to sentence the defendant to death. Except for the addition of a fourth question, that much of the sentencing procedure remains essentially unaltered.[15] If the jury did not agree on the death penalty, the trial court was required to impose a sentence of ordinary life. Since the 1989 amendment, however, when a jury does not agree affirmatively and unanimously on the death penalty questions, the presumptive sentence that the trial court must impose is *true life* — unless 10 or more members of the jury further agree that the presumptive sentence should be reduced to ordinary life.

Had the 1989 legislature merely substituted the definition of life imprisonment, changing it from "ordinary life" to "true life," the increase in punishment would be obvious. However, because ordinary life still is a valid sentence for aggravated murder, the state argues that the legislature intended the true life sentence to be only an *intermediate* sentencing option. The state argues that, indeed, the legislature intended to *decrease* punishment for most defendants convicted of aggravated murder by giving juries a sentencing option that is more burdensome than ordinary life but not so burdensome as death.

---

[14] ORS 163.150(2)(a) provides, in part:

"[t]he trial court shall sentence the defendant to life imprisonment without the possibility of release or parole, as described in ORS 163.105(1)(b), unless 10 or more members of the jury further find that there are sufficient mitigating circumstances to warrant life imprisonment, in which case the trial court shall sentence the defendant to life imprisonment as described in ORS 163.105(1)(c)."

[15] A fourth question was added in 1989, Or Laws 1989, ch 790, § 135b, and construed by this court in 1990. *State v. Wagner*, 309 Or 5, 18-20, 786 P2d 93 (1990). Further amendments to the procedure for determining applicability of the death penalty were made in 1991. Or Laws 1991, ch 725, § 2; Or Laws 1991, ch 885, § 2. Those amendments are not pertinent to this opinion.

The state's argument is not well taken. At the time of defendant's crime, the presumptive sentence for aggravated murder where a sentence of death was not imposed was ordinary life. The presumptive sentence in such a case at the time of defendant's trial was true life. True life clearly is a more burdensome punishment than ordinary life. The fact that a jury, by a vote of 10, affirmatively could have found mitigating circumstances sufficient to warrant reducing the true life sentence to ordinary life does not alter the calculation. The new sentence structure increased the presumptive punishment for a crime. Retroactive imposition of that punishment violated Article I, section 21, of the Oregon Constitution, and Article I, section 10, of the Constitution of the United States.

The decision of the Court of Appeals is affirmed, in part on different grounds. The judgment of the circuit court is affirmed as to defendant's conviction for aggravated murder. The sentence for aggravated murder is vacated, and the case is remanded to the circuit court for resentencing to life imprisonment rather than life imprisonment without possibility of parole.