Argued and submitted September 19, 1995; resubmitted In Banc March 6, reversed May 1, Picray's petition for review denied September 24, Secretary of State's petition for review allowed September 24, 1996 (324 Or 229)

# David PICRAY,
*Petitioner,*

*v.*

# SECRETARY OF STATE,
*Respondent.*

## (CA A85293)

916 P2d 324

David C. Force argued the cause and filed the brief for petitioner.

Rives Kistler, Assistant Attorney General, argued the cause for respondent. With him on the brief were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

HASELTON, J.

Armstrong, J., concurring.

De Muniz, J., dissenting.

## HASELTON, J.

Petitioner appeals from an order of respondent Secretary of State that imposed a $100 civil penalty for violating ORS 260.695(4), which prohibits wearing "political badge(s), button(s) or other insignia" in polling places. We conclude that ORS 260.695(4) violates Article I, section 8, of the Oregon Constitution, and reverse.

The facts are undisputed. During the November 1992 general election, Ballot Measure 9, an initiative to "prohibit government promotion, encouragement or facilitation of homosexuality, pedophilia, sadism and masochism," was a matter of considerable public discussion and debate. The ballot measure summary for Measure 9 stated, in part:

"All levels of government, including public education systems, must assist in setting a standard for Oregon's youth which recognizes that these 'behaviors' are *abnormal, wrong, unnatural and perverse*' and that they are to be discouraged and avoided." (Emphasis supplied.)

The Oregon Citizens Alliance was a major proponent of that initiative.

On the date of the general election, November 3, petitioner appeared at a polling place in North Albany wearing two buttons, each approximately two inches in diameter. The first said, "STOP THE OCA"; the other, "THE OCA IS ABNORMAL AND PERVERSE." Elections workers told petitioner that he could not vote unless he removed the buttons. Petitioner refused, and, after discussions with police and local elections officials, he left the polling place and contacted the local media. When reporters arrived, petitioner reentered the polling place where, after again being barred from voting, he was arrested for trespassing.[1]

The election director for Benton County subsequently filed a complaint with the Secretary of State's office, pursuant to ORS 260.345,[2] asserting that petitioner may

---

[1] The Benton County District Attorney charged petitioner with criminal trespass in the second degree, ORS 164.245. He was subsequently acquitted of that charge.

[2] ORS 260.345(1) provides, in pertinent part:

have violated ORS 260.695(4). That statute provides: "No person, within a polling place,[3] shall wear a political badge, button or other insignia." After a contested-case hearing, the hearings officer determined that petitioner had violated ORS 260.695(4) and recommended imposition of a $100 civil penalty. ORS 260.995. In so concluding, the hearings officer found that petitioner's buttons were "political" within the meaning of ORS 260.695(4), because a reasonable person would understand the buttons to communicate a message regarding a candidate, party, or measure:

> "[Petitioner's] buttons, stating 'STOP THE OCA' and 'THE OCA IS ABNORMAL AND PERVERSE' communicated a message that was, in the context of the 1992 general election, understood by reasonable persons as referring to and opposing Measure 9, a measure on the ballot."

Respondent's final order of June 17, 1994, adopted the hearings officer's proposed findings of fact and law in their entirety.

On appeal, petitioner raises a battery of statutory and constitutional challenges to respondent's order. We first address petitioner's subconstitutional contentions. *Planned Parenthood Assn. v. Dept. of Human Res.*, 297 Or 562, 564, 687 P2d 785 (1984).

■ Petitioner asserts that respondent's treatment of the underlying complaint was procedurally defective in two respects: (1) Respondent violated ORS 260.345(3) by failing to notify him of the complaint within 48 hours after respondent received the complaint.[4] (2) Respondent further violated

---

"Any elector may file with any filing officer a written complaint alleging that a violation of an election law or rule adopted by the Secretary of State under ORS chapters 246 to 260 has occurred and stating the reason for believing that the violation occurred and any evidence relating to it."

[3] We note, without elaboration, that the recent proliferation of vote-by-mail elections may render ORS 260.695(4) an anachronism. Notwithstanding that proliferation, the term "polling place" refers, as it has historically, to a single, designated location in each precinct. *See, e.g.,* ORS 246.420; ORS 254.245.

[4] ORS 260.345(3) provides, in part:

"Upon receipt of a complaint under subsection (1) or (2) of this section the Secretary of State or Attorney General immediately shall examine the complaint to determine whether a violation of an election law or rule has occurred and shall make any investigation the Secretary of State or Attorney General considers necessary. Except as provided in this subsection, within 48 hours of

ORS 260.345(3) by failing to immediately examine the complaint and to complete his investigation within a reasonable time. However, neither of those arguments was raised or preserved in the contested case hearing. We will not consider them for the first time on appeal. *See, e.g., Marbet v. Portland Gen. Elect.*, 277 Or 447, 456, 561 P2d 154 (1977).

We proceed, then, to petitioner's constitutional challenges. Petitioner contends, principally, that ORS 260.695(4) violates the free expression protections of Article I, section 8, of the Oregon Constitution.[5] Invoking *State v. Robertson*, 293 Or 402, 649 P2d 569 (1982), and its progeny, he argues that ORS 260.695(4) embodies a "content-focused" prohibition of expression that does not fall within the scope of any historically recognized exception to free expression protections and, thus, runs afoul of Article I, section 8.[6]

Respondent assumes, and does not dispute, that ORS 260.695(4) embodies a content-driven limitation of expression.[7] That assumption is correct; the statute, by its terms, is directed at political expression and does not mention, much less focus on, forbidden effects of displaying political paraphernalia in polling places.

---

receiving a complaint under subsection (1) or (2) of this section, the Secretary of State or Attorney General shall notify the person who is the subject of the complaint that a complaint has been received."

[5] Article I, section 8, of the Oregon Constitution provides:

"No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right."

[6] Petitioner argues, alternatively, that ORS 260.695(4) violates the *ex post facto* clause of the Oregon Constitution, Article I, section 21. In particular, he asserts that, because the term "political" is not defined in the statute itself or in any ancillary regulation, elections officials have impermissibly broad, "standardless" and subjective ability to give content to that term in the context of after-the-fact enforcement proceedings. Respondent counters that Article I, section 21, is inapposite in that it "applies to substantive changes in criminal law and sentencing," *State v. Wille*, 317 Or 487, 502, 858 P2d 128 (1993), and not to civil enforcement proceedings. In the light of our disposition, we need not, and do not, address the parties' *ex post facto* arguments.

[7] Indeed, the hearings officer's proposed order, which respondent adopted in its totality, stated:

"ORS 260.695 is among the first category and most restrictive of laws under the *Plowman* analysis—it focuses on the *content* of speech and is directed to the substance of the communication. *State v. Plowman*[, 314 Or 157, 164, 838 P2d 558 (1992), *cert den* 508 US 974 (1993)]." (Emphasis in original.)

Respondent argues that ORS 260.695(4) is nevertheless constitutional for two alternative reasons. First, the statute falls within the so-called "incompatibility" exception described in *In re Fadeley*, 310 Or 548, 802 P2d 31 (1990). Second, regardless of whether ORS 260.695(4) would be constitutional under Article I, section 8, alone, the statute's enactment and enforcement is independently authorized—and, by implication, constitutionally immunized—under Article II, section 8, of the Oregon Constitution.[8] That provision, which, like Article I, section 8, was included in the original Oregon Constitution of 1857, states:

> "The Legislative Assembly shall enact laws to support the privilege of free suffrage, prescribing the manner of regulating, and conducting elections, and prohibiting under adequate penalties, all undue influence therein, from power, bribery, tumult, and other improper conduct."

Respondent further argues that, to the extent there is any potential conflict between Article I, section 8, and Article II, section 8, with respect to the constitutionality of ORS 260.695(4), appropriate "harmonization" of the two contemporaneously ratified provisions saves the statute.[9]

---

[8] Respondent also suggests, in passing, that, under the analysis of Justice Graber's special concurring opinion in *Moser v. Frohnmayer*, 315 Or 372, 380, 845 P2d 1284 (1993), ORS 260.695(4) may be sustained as a valid "time, place and manner" restriction. Respondent acknowledges, however, that, given the majority opinion in *Moser*, that argument "is directed more at the Supreme Court than this court." We agree.

[9] Respondent's order below was based, ultimately, on the determination that ORS 260.695(4) was constitutional under Article I, section 8, because Article II, section 8, embodied a well-established historical exception within the *Robertson / Plowman* analysis. On appeal, and in response to petitioner's arguments, respondent abandons—and, indeed, criticizes—that characterization:

"As petitioner frames the issue, the question is whether Article II, section 8 of the Oregon Constitution constitutes an historical exception to Article I, section 8. In the Secretary's view, petitioner asks the wrong question. Article II, section 8 was not added to the constitution simply to provide an historical basis for interpreting Article I, section 8. It is an independent direction to the legislature to enact laws 'to support the privilege of free suffrage, prescribing the manner of regulating and conducting elections.' * * * The two constitutional provisions were adopted at the same time and [are] entitled to equal dignity.

"In the Secretary's view, the question is or should be how much authority does Article II, section 8 allocate to the legislature to regulate the way elections are conducted."

■ Respondent's reliance on the "incompatibility" exception is unavailing. In *Fadeley*, the court noted that restrictions on a public servant's expression may be valid where the expression is incompatible with that person's "official function." 310 Or at 563. *Accord Cooper v. Eugene Sch. Dist. No. 4J*, 301 Or 358, 377, 723 P2d 298 (1986) ("[E]xpression that could not constitutionally be prohibited outright may nevertheless be found incompatible with the performance of an official professional role."); *In re Lasswell*, 296 Or 121, 124-26, 673 P2d 855 (1983) ("incompatibility" between district attorney's rights of free expression and official function regarding accused's right to fair trial). Whatever the merits of applying the incompatibility exception to elections officials or poll workers, that exception is not so elastic as to cover citizens exercising the franchise. *Fadeley, Lasswell, Cooper*, and other related cases emphasize that the exception applies only to public officials or public servants. That is, because of the actor's official capacity, the expression is not purely personal. In contrast, nothing about the mere act of voting transforms an individual's personal political expression into "official speech." Thus, ORS 260.965(4) does not fall within any "incompatibility" exception to Article I, section 8.

Respondent's alternative argument is pitched to Article II, section 8, and urges us to reconcile and balance the dictates of that provision with those of the concurrently ratified Article I, section 8. As we understand it, respondent's argument is that statutes promulgated pursuant to express constitutional authorization (here, allegedly Article II, section 8) are to be assessed differently *vis-a-vis* the free expression protections of Article I, section 8, than are statutes promulgated under the legislature's plenary authority. Although the latter must pass muster under the *Robertson* analysis, the former, in respondent's view, are subject to a balancing analysis by which the potential impairment of expression is to be weighed against the promotion of the contending constitutional interest (here, allegedly the promotion of the franchise). Respondent asserts:

> "That task is not difficult. The framers intended that the legislature would have greater latitude in regulating the manner in which elections would be conducted than it would otherwise have. When, as in this case, a law is both

limited to the manner of conducting elections and supports the privilege of free suffrage, that law is constitutional even though it also minimally restricts political expression.[8]

"[8] The restrictions stated in ORS 260.695(4) are limited in two respects. First, the statute only applies in the polling place. Anywhere else, petitioner is free to wear whatever buttons he chooses. Second, because the polling place only exists for one day, the statute is limited temporally as well. The effect on petitioner's expression of his political views is minimal."

As support for his "harmonizing" approach, respondent again invokes *Fadeley. See Fadeley*, 310 Or at 560 ("[T]here are two potentially conflicting provisions in the constitution—Article I, section 8, and Article VII (Amended), section 8. It is our function to harmonize the two.").[10] We do not reach the provocative issue of whether Article I, section 8, and Article II, section 8, must be reconciled in the manner respondent espouses, because respondent's argument fails at the threshold: ORS 260.695(4) is not a statute of the sort specified in Article II, section 8. Consequently, there is nothing to "harmonize."

■ In determining the scope and content of Article II, section 8, we examine its "specific wording, the case law surrounding it, and the historical circumstances that led to its creation." *Priest v. Pearce*, 314 Or 411, 415-16, 840 P2d 65 (1992).

The text of Article II, section 8, directs the legislature to "enact laws to support the privilege of free suffrage" by: (1) "prescribing the manner of regulating and conducting elections," and (2) "prohibiting under adequate penalties, all

[10] In *Fadeley*, the court concluded:

"When the people, in the face of a pre-existing right to speak, write, or print freely on any subject whatever, adopt a constitutional amendment that by its fair import modifies that pre-existing right, the later amendment must be given its due. * * * To hold otherwise would be to deny the later enacted portions of the constitution equal dignity as portions of the same fundamental document." 310 Or at 560.

We observe, without further comment, that, unlike Article VII (Amended), section 8, which was addressed in *Fadeley*, Article II, section 8, and Article I, section 8, were ratified concurrently.

undue influence therein, from power, bribery, tumult, and other improper conduct." Respondent contends that both of those phrases authorize ORS 260.695(4). In particular, respondent asserts that ORS 260.695(4) embodies a specific prohibition of "undue influence * * * from * * * improper conduct" within the meaning of the second phrase. Alternatively, and more broadly, respondent contends that ORS 260.695(4) prescribes "the manner of conducting elections," as contemplated in the first phrase. We address the more particular provision first.

Two aspects of the text of Article II, section 8's, second phrase are striking. First, that provision focuses not on conduct, but on effect—"*undue* influence." (Emphasis supplied.) Second, the provision lists the prohibited means of achieving that prescribed effect: "power, bribery, tumult, and *other* improper conduct." (Emphasis supplied.) Although the term "other improper conduct" is not explicitly defined or circumscribed, the use of "other" indicates that conduct falling within that category includes, and partakes of, the same qualities as the three specifically listed behaviors. *See, e.g., Skinner v. Keeley*, 47 Or App 751, 757, 615 P2d 382 (1980) (applying *ejusdem generis* principle of statutory construction: "Where general words follow the enumeration of specific classes of things, the general words are to be construed as restricted to things of the same type as those specifically enumerated.").

"Power, bribery [and] tumult" all describe active, demonstrably coercive conduct calculated to subvert free suffrage. Each of those behaviors can effect undue influence by impeding, intimidating, or impermissibly inducing the exercise of the franchise.

■ The mere passive display of a political button or badge in a polling place does not constitute "improper conduct" of the sort contemplated in Article II, section 8. The silent expression of political opinion is not coercive. To the extent that such expression in the polling place might affect the votes of others, that influence cannot be deemed constitutionally "undue." Thus, the second phrase of Article II, section 8, does not authorize ORS 260.695(4).

■　　The dissent suggests that, in so holding, we are impermissibly substituting our judgment for the legislature's. *See* 140 Or App at 608-09. We respectfully disagree. Article II, section 8, does not give the legislature absolute authority to prohibit any and all conduct relating to elections. Rather, the legislature's authority pertains only to prohibiting *"undue* influence from * * * *improper* conduct." "Undue influence" and "improper conduct" are terms of constitutional limitation. In construing those terms, and enforcing their limitation, we are performing a judicial function, and not usurping the legislature's prerogatives.

Indeed, under the dissent's deferential approach, the legislature would be free to prohibit a broad range of "unduly" influencing conduct—from candidates' speeches, to displaying bumper stickers, to endorsements from the pulpit—subject only to *Fadeley*-esque "balancing." Thus, in the dissent's view, political speech would, ironically, be afforded *less* constitutional protection than other speech. We cannot agree that Article II, section 8, implicitly denies such vital expression the same protection that Article I, section 8, affords expression generally.

The historical context of Article II, section 8—the contemporaneous circumstances both before and immediately after its enactment—buttresses our conclusion.[11] In the mid-19th century, polling places were not politically neutral zones. They were, instead, characterized by boisterous public political advocacy. *See Burson v. Freeman,* 504 US 191, 112 S Ct 1846, 119 L Ed 2d 5 (1992) (summarizing history of election reform in the United States in plurality decision rejecting a First Amendment challenge to Tennessee law prohibiting solicitation of votes and display or distribution of campaign literature within 100 feet of a polling place). The public display of political paraphernalia, including at the polling place, was pervasive.[12] Indeed, Oregon did not adopt

---

[11] It appears that the proceedings and debates of the 1857 constitutional convention itself did not address the meaning and content of Article II, section 8. *See* Charles Carey, *The Oregon Constitution* (1926) (hereafter "Carey").

[12] The use of political badges, ribbons, buttons and related paraphernalia dates to at least 1828:

"One facet of presidential electioneering for more than a century and a half has been the use of material objects to attract votes. From the medalets, thread

the modern secret ballot system, including official ballots, private polling booths, and restrictions on who, other than electors, could enter polling places, until 1891.[13]

Nevertheless, even before 1859, territorial legislation restricted demonstrably coercive and disruptive conduct at polling places:

"For the preservation of order, as well as the security of the judges and clerks of the election from insult and abuse, it shall be the duty of the constable or constables, residing

---

boxes, and bandannas promoting Andrew Jackson or John Quincy Adams in 1828 through the [modern buttons and] bumper stickers, * * * every presidential race has inspired and utilized material objects for partisan purposes. Tens of thousands of artifact varieties have been produced for use as badges, regalia, mass visual devices, or personal keep-sakes. Marvelously eclectic, the genre encompasses objects as small as a bobby pin and as large as a highway billboard or a boulevard banner twenty feet high and three times as long, as mundane as a thimble or matchbook and as exotic as a walking-stick crafted from the petrified reproductive organ of a bull, as tasteful as a cut crystal 1860 Abraham Lincoln bowl, and as monumentally tasteless as a 1956 stamp predicting that Dwight Eisenhower's re-election would trigger his death from a heart attack." Roger A. Fischer, *Tippecanoe and Trinkets Too* vii-viii (1988).

William Henry Harrison's "Log Cabin" presidential campaign of 1840 inundated voters with a variety of political items including "more than five dozen known types of clothing buttons, an equal number of medalets and tokens, nearly two hundred styles of silk ribbons[.]" *Id.* at 33-34. One year before Article II, section 8's adoption, John C. Fremont's 1856 presidential campaign similarly featured silk ribbons with his image and campaign slogans. *Id.* at 76.

[13] *See* 2 Codes and Statutes of Oregon, Title XXVIII (Bellinger and Cotton 1902). Article II, section 15, which was included in the original 1857 Oregon Constitution, provides:

"In all elections by the Legislative Assembly, or by either branch thereof, votes shall be given openly or *viva voce* and not by ballot, forever; and in all elections by the people, votes shall be given openly, or *viva voce*, until the Legislative Assembly shall otherwise direct."

The dissent invokes Article II, section 15, as constitutional context corroborating its view that Article II, section 8, affords the legislature " 'greater latitude to balance free expression at the polling place against the goal of free and fair elections.' " 140 Or App at 609.

A review of the history of Article II, section 15's enactment refutes that expansive construction. At the time of the constitutional convention, the framers engaged in extensive discussion about the merits of the then-existing *viva voce* voting system, which involved open, oral expression of one's vote, rather than the use of printed ballots. *See Carey* 325-26, 329, 331, 337-38, 340-41, 346-47. That debate focused solely on the merits of oral voting versus use of printed ballots and did not refer at all to general regulation of conduct or expression at the polling place. The resulting text of Article II, section 15, granted the legislature prospective authority to alter the method by which votes were cast. Nothing more; nothing less.

within the township or district * * * to attend at all the elections within such township or district; * * * and *any person who shall conduct [himself] in a disorderly or riotous manner at such election*, and persists in such conduct after being warned of the consequences, may upon the order of said judges, be taken into custody and removed from the neighborhood of said election, during the time the polls may remain open; such person shall also be liable for the crime or misdemeanor committed by him during such disturbance, in the manner and to the extent prescribed by law." Oregon Statutes of A General Nature, Elections § 13 (Hamilton Code) (1851) (emphasis supplied).

In contrast, respondent does not cite, and our own research does not disclose, any pre-1859 statute prohibiting or restricting passive political expression in polling places.

Nor were such prohibitions imposed immediately following the constitution's ratification. Rather, statutes enacted in 1864 and 1870 reiterated the emphasis of the pre-statehood measures by providing for criminal and civil penalties for bribery, threats, and disorderly and riotous conduct. *See, e.g.,* General Laws of Oregon, ch 5, §§ 627-35, p 428-29; ch 14, § 20, p 570 (Deady & Lane 1843-1872). It was not until 1909, a half-century after statehood, that the original antecedent to ORS 260.965(4), Lord's Oregon Laws § 3516 (1909), was enacted.[14] Thus, reference to historical context confirms that ORS 260.695(4) is not within the compass of the second phrase of Article II, section 8.

■ We turn, finally, to the more general language of the first phrase of Article II, section 8. Respondent argues that ORS 260.695(4) "prescribes the manner of regulating and conducting elections" within the meaning of that phrase.

---

[14] Lord's Oregon Laws § 3516 (1909) provides:

"It shall be unlawful for any person to pay another for any loss or damage due to attendance at the polls, or in registering, or for the expense of transportation to or from the polls. No person shall pay for personal service to be performed on the day of a caucus, primary, convention, or any election, for any purpose connected therewith, tending in any way, directly or indirectly, to affect the result thereof, except for the hiring of persons whose sole duty is to act as challengers and watch the count of official ballots. *No person shall buy, sell, give, or provide any political badge, button, or other insignia to be worn at or about the polls on the day of any election, and no such political badge, button, or other insignia shall be worn at or about the polls on any election day.*" (Emphasis supplied.)

That construction is unpersuasive for three reasons. First, it does not adequately acknowledge the text's immediately preceding and predominant directive: "The Legislative Assembly shall enact laws to *support the privilege of free suffrage[.]*" (Emphasis supplied.) Thus, Article II, section 8, refers only to those measures that enable, or prevent the impediment of, the free exercise of the franchise. ORS 260.695(4) does neither. The statute indiscriminately punishes the mere display of political paraphernalia without referring to, much less requiring any showing of, some adverse effect on suffrage.

Second, the first phrase of Article II, section 8, must be read in the context of the second. Respondent's all-encompassing construction of the former would make the latter superfluous. If the first phrase did, in fact, affirmatively authorize any and all regulation of conduct relating to elections, it would necessarily subsume prohibitions of undue influence, rendering the second phrase extraneous. We decline to regard the second phrase as a nullity; accordingly, we reject respondent's omnibus construction of the first. *See State ex rel Gladden v. Lonergan*, 201 Or 163, 177, 269 P2d 497 (1954) (quoting and applying 11 Am Jur § 55 at 665, Constitutional Law (1937): " 'An elementary rule of construction is that if possible, effect should be given to every part and every word of a Constitution and that unless there is some clear reason to the contrary, no portion of the fundamental law should be treated as superfluous.' ").

Instead, consistently with the constitutional text and context, we construe the first and second phrases as addressing qualitatively different concerns. The second focuses on regulation of "intramural" influences in the electoral process— that is, on conduct or expression that affects whether, or how, individual electors cast their votes. To the extent that an influence is "undue," it may be punished; otherwise, it is not within the purview of the second phrase, or of Article II, section 8, generally. Conversely, and necessarily, the first phrase, although broad, pertains to legislative oversight of matters other than "influencing" conduct or expression. *See, e.g.*, ORS chs 246, 254. Thus, the first phrase does not authorize prohibitions of electors' conduct calculated to influence the voting behavior of others.

Third, respondent's construction would permit the state to restrict any and all potentially "influencing" conduct, subject only to *Fadeley*-esqe "harmonization." *See* 140 Or App at 597-99.

Again, historical context confirms our construction. Before 1857, a panoply of territorial legislation regulated the "mechanics" of the electoral process; however, none of those measures purported to regulate citizens' "influencing" conduct within the polling place, except to the extent that such conduct was demonstrably disruptive or disorderly. *See* 140 Or App at 601-02. The same was true of elections measures enacted immediately after statehood and for a half-century thereafter. *Id.* Thus, the only contemporaneous prohibitions on electors' expression pertained to disruptive and coercive conduct and, thus, corresponded to the second phrase of Article II, section 8. There is no historical evidence—or, at least, none that we have been able to discover—that the first phrase independently authorizes restrictions of citizens' "influencing" conduct at the polling place that are not otherwise encompassed within the second phrase.

We conclude that ORS 260.695(4) does not fall within either of Article II, section 8's two operative phrases. In so holding, we do not, of course, imply that the legislature lacked the *plenary* authority to enact ORS 260.695(4), subject to the constraints of Article I, section 8. Rather, we hold that that statute was not, and could not have been, enacted pursuant to some independent, express, nonplenary constitutional authorization. Consequently, whatever the propriety of respondent's proposed balancing analysis in other constitutional contexts, the predicate for that analysis does not exist here. There is nothing to "harmonize" in this case.

Our inquiry thus reduces and returns to Article I, section 8. Because ORS 260.695(4) focuses on the content of expression, rather than on any properly regulable effect of such expression, and does not fall within any recognized exception to Article I, section 8, *see* 140 Or App at 596-98, it is unconstitutional. Respondent's order imposing a penalty for violating ORS 260.695(4) must be reversed.

Reversed.

**ARMSTRONG, J.,** concurring.

The majority and the dissent divide over whether ORS 260.695(4) is a law that implements the requirement in Article II, section 8, of the Oregon Constitution that the legislature enact laws to secure free and fair elections. Although I agree with the majority that ORS 260.695(4) is not a law that implements that requirement, I believe that this case can be resolved more simply by recognizing that Article II, section 8, has no bearing on the constitutionality of that law.

The legislature has plenary power to enact laws. That means that it can enact any law that it wants as long as the law does not violate a prohibition in the state or federal constitution against its enactment. Consequently, there is no reason to give the legislature specific authority to enact laws regulating the conduct of elections, as respondent contends Article II, section 8, does, because the legislature already has the power to do that.

Properly understood, Article II, section 8, and comparable provisions, such as the requirement in Article VIII, section 3, that the legislature establish "a uniform, and general system of Common schools," impose obligations on state government. They require the legislature to do certain things, which is why they are in the constitution. They do not give the legislature any greater authority to do the things that they command, however, because the legislature's plenary authority already gives the legislature all of the power that it needs to do that.

Because Article II, section 8, and comparable provisions are not a source of authority beyond the plenary authority the legislature already has to act, there is no occasion to balance those provisions against the limitations on government found elsewhere in the constitution to determine which commands on government must be obeyed. They all are expected to be obeyed according to their terms.

If the constitution were understood to work the way respondent contends it does, it would require the legislature to weigh competing constitutional commands in order to determine which are more important, without any intelligible standard by which to make that judgment. Assume, for

example, that the legislature concluded that the state could not afford to fund an adequate system of common schools for all children in the state, but that it could afford to fund a system for half the children. Could it enact a law that excludes all boys from public school, notwithstanding the command in Article I, section 20, that no law be passed granting privileges to one class of citizens that are not granted to others on equal terms, on the ground that one obligation is more important than the other?

If it did, how would a court evaluate that choice in a case challenging the law, and on what kind of record. Fundamentally, there is no coherent way for us to balance one constitutional obligation against the other except by making our own policy choice about which obligation is more important, or by deferring, as the dissent suggests we should in this case, to the legislature's policy choice. Nothing suggests that the constitution was intended to impose on the legislature or us the obligation to make choices of that kind, because nothing suggests that the relevant constitutional provisions add anything to the legislature's plenary authority to enact laws.[1]

In summary, the issue in this case is whether ORS 260.695(4) violates Article I, section 8. For the reasons stated by the majority, it does. Article II, section 8, adds nothing relevant to the analysis.

**DE MUNIZ, J.,** dissenting.

ORS 260.695(4) prohibits any person from wearing a political badge, button or other insignia in a polling place. Article II, section 8, authorizes the legislature to keep elections free from "all undue influence therein, from power, bribery, tumult, and other improper conduct." The majority decides that "other improper conduct" must be "active, demonstrably coercive conduct" and that displaying a political button or badge is a "mere passive display[.]" 140 Or App at 600. Therefore, the majority concludes, a political badge or

---

[1] *See generally* Hans A. Linde, *Fair Trials and Press Freedom—Two Rights Against the State,* 13 Will LJ 211, 214-18 (1977) (state constitutional obligation to conduct fair criminal trials is not a source of authority to restrict free speech rights guaranteed by the state constitution). For example, the commands in Article I, section 8, and Article II, section 8, both impose requirements on the government. The legislature is obliged to comply with both, not use one to evade the other.

button cannot constitute "other improper conduct," and ORS 260.695(4) is "not a statute of the sort specified in Article II, section 8." 140 Or App at 599. I dissent.

The majority reasons from the faulty premise that a written word or symbol is passive. The buttons at issue here amply demonstrate otherwise. In the context of the 1992 election, the buttons were "fighting words" fully intended to evoke strong positive and negative reactions in viewers. Nonetheless, the majority concludes that, because the message of a badge or button is not oral, it cannot "effect undue influence by impeding, intimidating, or impermissibly inducing the exercise of the franchise." 140 Or App at 600. With all due respect, that determination is one that the constitution permits the legislature, not the courts, to make.

The majority's historical analysis does not persuade me otherwise. The majority concludes that, because political badges existed at the framing of the constitution but were not regulated, they cannot later be subject to restriction. The plain language of Article II, section 8, however, speaks of "other" conduct. Wearing a political badge is "other" conduct. The majority holds, however, that *ejusdem generis* requires that that conduct must necessarily partake of the coercive quality of "power, bribery, [and] tumult."[1] However, "power" and "tumult" are not the kind of specific enumerations ordinarily encompassed by *ejusdem generis*. *See State of Oregon v. Brantley*, 201 Or 637, 271 P2d 668 (1954) (*ejusdem generis*, especially applicable to criminal statutes, was applied to construe criminal statute relative to uttering a forged instrument reading "false, altered, forged or counterfeited record, writing, instrument or matter whatever"); *Skinner v. Keeley*, 47 Or App 751, 757, 615 P2d 382 (1980) (*ejusdem generis* applied to lien statute phrase "promissory note or other personal obligation").

---

[1] It is not completely clear just what kind of "conduct" the majority deems coercive, although the suggestion is strong that it must be physical: Mid-19th century polling places were "characterized by boisterous public political advocacy." 140 Or App at 601. Under the majority's reasoning, it appears that no written expression could be regulated, irrespective of the size or message.

If Article II, section 8, is read, as it should be, in the context of Article II, it is not necessary to resort to principles of statutory construction. Article II governs elections, and section 15, along with section 8, addresses how elections should be conducted. Section 15 provides that "in all elections by the people, votes shall be given openly, or *viva voce*, until the Legislative Assembly shall otherwise direct." As respondent states, that section

"gives the legislature unique authority in two respects. First, it authorizes the legislature to vary a constitutionally prescribed method of conducting elections. Second, it recognizes that the legislature may legitimately determine that 'open advocacy' in the polls is not consistent with the constitutional goal of 'free suffrage.' Article II, section 15 reflects the framers' understanding that the legislature would have greater latitude to balance free expression at the polling place against the goal of free and fair elections."

I agree with respondent that the same understanding is evident in Article II, section 8. Section 8 gives the legislature the authority to regulate speech, which it otherwise would not have, if the speech is in the environment of the polling place.

Petitioner assumes that Article I, section 8, "trumps" the grant of authority in Article II, section 8. However, our function is to harmonize Article I and Article II. *In re Fadeley*, 310 Or 548, 560, 802 P2d 31 (1990). I agree with respondent that that harmony is not difficult here: The framers intended that the legislature would have greater latitude in regulating the manner in which elections would be conducted than it would otherwise have. I would hold that ORS 260.695(4), which is limited to how elections are conducted, is constitutional even though it minimally restricts political expression.

Because ORS 260.695(4) comes within the authority granted the legislature under Article II, section 8, it is for the legislature, not us, to determine whether "passive" advocacy has any role in the polling place. The legislature could conclude that exhibiting political buttons or badges within the polling place is "improper conduct" that could unduly influence a voter's decision in casting a ballot. The majority errs in

substituting its judgment for that of the legislature by holding that the influence of "such expression in the polling place * * * cannot be deemed constitutionally 'undue.' "[2] 140 Or App at 600.

Warren, Deits, and Riggs, JJ., join in this dissenting opinion.

---

[2] The majority provides a "parade of horribles" as to practices that it concludes that the legislature could impose "under the dissent's deferential approach[.]" 140 Or App at 601. None of that parade is before us.